STATE, RESPONDENT, v. JONES, APPELLANT.

(No. 7,147.)

(Submitted October 2, 1933. Decided November 3, 1933.)

[26 Pac. (2d) 341.]

318

*Mr. H. C. Crippen* and *Mr. H. C. Crippen, Jr.,* for Appellant, submitted a brief; the former argued the cause orally.

320

*Mr. Raymond T. Nagle,* Attorney General, *Mr. C. J. Dousman,* Assistant Attorney General, *Mr. Horace S. Davis* and *Mr. P. R. Heily,* for the State, submitted a brief; *Mr. Dousman* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On January 2, 1932, two men entered the office of the treasurer of Stillwater county, bound and gagged the treasurer, Florence Raiff, and fled with approximately $6,000 of the county's funds. Investigation indicated that Harry O'Donnell, of Billings, there known as, and hereinafter called, Smith, was one of the robbers. The next day Smith and one Jorgenson left the state; they were later apprehended at Sioux City, Iowa, and returned to Stillwater county, charged with the crime. Smith made a statement to the officials to the effect that the crime was planned by this defendant, Wesley Jones, and committed by himself and Clyde Kipp. Jorgenson was discharged from custody and an information was filed against Jones, Smith and Kipp. Smith entered a plea of guilty. Jones and Kipp were granted separate trials. Kipp was first tried and convicted. Jones was then tried and, on the testimony of Smith supplemented by certain facts and circumstances brought out on the trial, was convicted and sentenced to a term of ten years in the state prison; he has appealed from the judgment and from an order denying him a new trial.

The determinative question presented is whether or not the independent facts and circumstances sufficiently corroborate the testimony of Smith to sustain the judgment.

The controlling statute declares that "a conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." (Sec. 11988, Rev. Codes 1921.)

Smith's testimony is, in substance, as follows: He had known Jones for about a year, when, in November, 1931, in Jones' barber-shop in Billings, Jones stated that he knew where "some money" could be "easily got without much danger." Thereafter they talked the matter over, "just a word here and there," but Jones did not disclose his plan until about December 1, when he told Smith that it was to rob Stillwater county and suggested that they "look over the road." Smith was at the time a radio salesman, working under one Roloff; on pretext of a prospect he secured Roloff's car for the reconnaissance, and with Jones drove to Edgar, where Jones bought gasoline and oil, paying therefor with a check; they drove to Columbus and there Jones telephoned Miss Raiff from a barber-shop in which he had worked before moving to Billings. The two then had dinner, some time after 5 P. M., and then drove to the home of Miss Raiff, picked her up, and then drove to the courthouse, where Smith "looked over the vault." On their return to Billings, Jones asked Smith if he "had the office clear in mind."

Jones brought Kipp into the conspiracy about two weeks later and suggested that Smith and Kipp "look over the road," and they drove through the country pretending to be prospective livestock buyers. Returning to Billings, Smith told Jones that they had "established an alibi."

On the night of January 1, 1932, Jones picked up Smith and Kipp at the Sunset Garage, in Billings, and, as they rode about town, declared: "To-morrow will be the day; there will be about $6,000 to go and get to-morrow." On the morning of January 28 Smith again secured the Roloff car and, with Kipp, drove to Columbus, where they drove about town until nearly

12 M., and then parked the car near the courthouse, from which coign of vantage they saw Miss Raiff, accompanied by a man and woman, leave; within a few minutes she returned alone. The men followed her into her office, told her to open the vault and to give them the keys, entered the vault, secured the money, and then bound and gagged Miss Raiff, who made no outcry or protest, and returned to Billings, hiding the money at an intermediate point. Smith secured the money that night and the next day divided with Jones "at the Samlin house" in Billings.

Were it not for the prohibition of the above statute, this testimony is, of course, ample proof of guilt; but, however damning the testimony of the accomplice may be, a conviction cannot stand unless that testimony is corroborated by independent evidence sufficient to meet the requirement of the statute. The question as to whether there is such corroboration is one of law for the court. (*State* v. *Yegen,* 86 Mont. 251, 283 Pac. 210.) This court has in the past made numerous pronouncements with reference to this statute, in harmony with one another but differing to meet the particular fact conditions under consideration; of these the following will be helpful here:

All of the testimony adduced, other than the testimony of the accomplice, including that of the defendant, must be considered, except that, if there be two or more accomplices, no statement of one can supply corroboration for another; this independent evidence need not be direct, it may be in whole or in part circumstantial. (*State* v. *Bolton,* 65 Mont. 74, 212 Pac. 504; *State* v. *McComas,* 89 Mont. 187, 295 Pac. 1011.)

It is not essential that the accomplice be corroborated upon every fact to which he testifies (*State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270), or that the independent evidence be sufficient to justify a conviction (*State* v. *Stevenson,* 26 Mont. 332, 67 Pac. 1001), or to connect the defendant with the commission of the offense (*State* v. *Calder,* 23 Mont. 504, 59 Pac. 903), for, under the statute, it is sufficient if it *tends* to connect the defendant with the commission of the crime (*State* v. *Bolton,* above).

however, it is necessary that the independent evidence lead to an "inference that the defendant is connected in a criminal way with the commission of the crime." (*State* v. *Geddes,* 22 Mont. 68, 55 Pac. 919, 924; *State* v. *Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026.) In other words, the independent evidence must be such that culpability on the part of the defendant may be deduced therefrom. (*Hendrix* v. *State,* 8 Okl. Cr. 530, 129 Pac. 78, 43 L. R. A. (n. s.) 546.)

The corroboratory evidence need not be strong, if as a matter of law it satisfies the requirements of the statute (*People* v. *Barker,* 114 Cal. 617, 46 Pac. 601), and in passing upon the weight to be given to corroboratory evidence, the jurors are at liberty to disregard or disbelieve the explanation of facts and circumstances as given by the defendant and his witnesses (*State* v. *Broell,* 87 Mont. 284, 286 Pac. 1108).

The presence of the defendant at or near the place where a conspiracy is said to have been formed, at or about the time of its forming, if formed at all, with any motive the defendant may be shown to have had for the commission of the crime, may be considered in this connection. (*State* v. *Bolton,* above.)

But the mere showing of opportunity to have joined in the commission of the offense, or evidence which raises a suspicion that the defendant was implicated, is not enough (*State* v. *Geddes,* and *State* v. *Spotted Hawk,* above), and where the facts and circumstances relied upon for corroboration are as consistent with innocence as with guilt, a conviction on the testimony of an alleged accomplice must be set aside (*Jolliffee* v. *State,* 21 Okl. Cr. 278, 207 Pac. 454). In line with this last pronouncement, the court instructed the jury that "such evidence is not sufficient corroboration * * * if it only raises in your mind a suspicion or probability of the defendant's connection with the crime charged; * * * you cannot find the defendant guilty * * * if you find all the facts and circumstances detailed in the evidence, apart from the testimony of the accomplice, are as consistent with defendant's innocence as with his guilt." This instruction became the law of the case.

Apart from the testimony of Smith, the state's case consisted of the following: Miss Raiff testified that Jones roomed at her home in Columbus prior to March, 1931, when he removed to Billings; that thereafter letters passed between them at least once a week; that he called her on the phone at times, came to see her, and took her out to dances. She testified that, about December 1, after office hours, Jones called her by phone, telling her he was in Columbus; thereafter Smith brought him to her house and left; she took Jones for a ride of about fifteen minutes in her car; they did not go near the courthouse; she then left Jones downtown. On New Year's Eve, at his solicitation, she, with a girl friend and her young man, attended a dance with Jones in Billings, returning home the next day. On January 2, she spent the forenoon in her office with her deputy and a deputy state examiner, who counted the cash and placed it in a box in the vault; at noon the three left the office and she went home; on reaching home she had a phone call to return to the office to issue an automobile license. She knew Jones' voice intimately and the call was not from him. On reaching the office she unlocked the door, stepped into a closet to hang up her wraps, and, returning, was confronted by two men who at the point of a gun demanded her keys and required her to open the vault. She testified that she was in fear of her life and too scared to cry out. The men bound and gagged her and, having secured the money, left, and immediately, with considerable effort, she worked her way across the room to a door communicating with the assessor's office, on which she succeeded in tapping with her heels. She stated that the banks had not been able to furnish the required security for county money, and she had been compelled to keep it in the vault, which fact was published in the Columbus paper, and, she thought, in the "Billings Gazette."

The assessor never left the courthouse for lunch and was therefore in his office; he heard the tapping, entered, and released Miss Raiff; he found her face and lips discolored from strangulation; her hands and feet showed the effect of the binding; she was hysterical and well-nigh overcome by her

experience. As soon as she was able she asked that the sheriff be called, and to him she told all that had happened. The deputy examiner told of the amount of money on hand.

The operator of the filling station at Edgar testified that Jones bought gas only on December 1, and that the check he gave was returned for insufficient funds.

John Samlin testified that Jones moved from the Broadway Hotel to his house February 1, and that about February 14 the sheriff searched the room occupied by Jones. In a coat belonging to Jones the sheriff found a paper which reads: "125.00 2/9, 1932. Received from ——, one hundred and twenty-five dollars. On account attorney fees case *State* v. *Jorgenson* and Smith at Columbus. Guy C. Derry."

Attorney Derry testified that he received the money from Jones and that he left the receipt blank because he did not know from whom the money came; that Jones first brought him $25 and, on his demand for the balance, went out and got it.

It was further shown that on January 3 a deputy sheriff called at the Smith-Jones room in the Broadway Hotel where he found Jones alone. After some conversation on indifferent subjects, Jones said, "Well, you might as well spill it; I know what you are here for."

The remainder of the evidence has to do only with facts and circumstances showing the commission of the crime and the connection of Smith and Kipp therewith.

From the testimony of the defendant, disregarding his ▆ explanations as to the suspicious circumstances brought out in the state's case—items to strengthen the case against him—we find that he was well, if not intimately, acquainted with Kipp, and that he ate lunch with Smith at 2 P. M. of the day of the robbery. He admitted stating that, at some time, he had been in the office of the treasurer at Columbus after nightfall.

The facts and circumstances, and the conclusions deduced therefrom, on which the state relies as corroboration of Smith's testimony, are as follows:

During the period of planning, as related by Smith, Jones was intimate with Smith and at the places where Smith says the conspiracy was formed.

Prior to the robbery Jones made the trip with Smith to Columbus "for no apparent purpose save in preparation for the robbery."

Jones was short of funds prior to the robbery; his check was returned.

Jones was intimate and on friendly terms with Kipp.

Miss Raiff came to Billings to see Jones and spent considerable time with him, just prior to the robbery.

The amount Smith says Jones told him would be there to get was confirmed by the testimony of the state examiner.

Smith testified that his motive in telling the facts was to protect his innocent friend Jorgenson, and in this he was corroborated, because Jorgenson could not have had anything to do with the robbery.

The telephone call to Miss Raiff could have come from no one but Jones, and, if he made the call, he was connected with the crime.

Jones was, at some time, at the treasurer's office at night.

Jones showed guilty knowledge by his statement to the deputy sheriff that he knew what the officer was there for, and in putting up money for the defense of Jorgenson and Smith.

As to the first and second of these items, the mere fact that a man's roommate turns out to be a criminal, and that their prior intimacy afforded an opportunity to conspire, does not tend to connect such a man with the commission of the crime nor corroborate the alleged accomplice as to the forming of a conspiracy between them.

Miss Raiff's testimony discloses a more plausible reason for Jones' trip to Columbus, a month before the robbery, than Smith's explanation that they went to "look over the road," with which both were familiar. A young man's desire to visit the young lady on whom he has bestowed his affections is sufficient urge to take him from his work even when he is short of funds.

As to the shortage of funds being a motive for robbery, the fact that Jones had no money prior to the robbery, if such is the fact, might be significant if it was shown that, after the robbery, he was in funds. The only evidence on the subject, however, is that from January 7 to 17, Jones was in a hospital where he incurred a doctor's bill of $150, which was not paid at the time of the trial.

Next, it is true that Jones had known Kipp for a year or more prior to the robbery, but not that they were intimate, and there is no evidence that Jones and Kipp were ever seen together. If Jones secured a car and took Smith and Kipp from the Sunset Garage for a ride about town on the evening of January 1, evidence to that effect should have been procurable; no such evidence was produced.

The fact that Miss Raiff spent New Year's Eve with Jones has no significance in the light of the fact that they had, for months, been together as often as possible; the occasion but gave them an opportunity to be together. Nor is it compromising that Miss Raiff could then have told Jones that there would be $6,000 in the vault the next day, which information Jones could have passed on to Smith and Kipp. If, as Miss Raiff testified, the fact that the treasurer was forced to keep tax moneys received in the vault was published, the newspapers contained all the information Smith and Kipp, or anyone else like minded, needed.

Smith's motive in telling his story to the officers is unimportant; had he, however, implicated Jorgenson instead of Jones, the circumstances of flight and possession of a part of the loot would have furnished a stronger case against Jorgenson than that made against Jones.

The assertion that the decoy telephone call to Miss Raiff came from Jones is refuted by Miss Raiff's testimony and by circumstances; she said it was not Jones' voice; Jones was in his shop at Billings at the time; he could have called only over long distance; had he done so the call would have been traced.

It is implied that Jones admitted that he was in the treasurer's office at the time Smith said he was there, i. e., Decem-

ber 1; but even without crediting his denial, the testimony on this point does not warrant the implication.

Jones' explanation of his statement to the officer that he knew why the officer called at the Smith-Jones room on the afternoon of January 3 is that he knew Smith was then wanted on a bad check charge and thought that the officer was there in that connection. While the defendant's explanations are to be disregarded, his statement, which could have been disproved if not a fact, can certainly be considered in interpreting his enigmatical remark.

The payment of a fee for the defense of Smith and Jorgenson is a suspicious circumstance, but its force is weakened by the intimation by the attorney for Smith that Jones was merely a messenger for someone else. (Jones testified that Kipp sent him to Derry because he (Kipp) was indebted to Derry.) But even if Jones was acting independently, the circumstance hardly rises to the dignity of evidence tending to connect Jones with the crime. It is conceivable that an innocent man, believing his friend and roommate to be innocent and believing him to be without funds, which was Smith's condition the last time Jones saw him, would interest himself to the extent of employing counsel to defend what he conceived to be an unjust charge.

A careful review of all of the independent testimony, bearing in mind that Smith's testimony must be entirely disregarded, convinces us that in its entirety it is as consistent with Jones' innocence as with guilt, and that no one fact or circumstance tends to connect Jones "in a criminal way" with the commission of the crime. As to a conspiracy being formed to commit the crime, there is no testimony, other than Smith's statement, to support the charge, and the rule that the presence of the accused at the time and place of the alleged conspiracy may be considered, has no application in the light of the fact that the "time" as stated by Smith, extended over a period of weeks, while the two roomed together, and the "place" was in the room, in the barber-shop, on the street, "just a word here and there."

Had the state proved the meeting of Jones, Smith and Kipp on the night of January 1, as it would seem it might easily have done, this rule would have been applicable; but no attempt was made to corroborate Smith in this important particular.

The independent testimony does no more than show opportunity for the defendant to have conspired to commit the crime and to raise a suspicion that he did so, and, without further corroboration which in fact tends to connect him with the commission of the offense, the judgment, based on the testimony of Smith, the accomplice if Jones is guilty, cannot stand.

The judgment is reversed and the cause remanded to the district court of Stillwater county for a new trial.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN and ANDERSON concur.

MR. JUSTICE STEWART: I concur, but with a degree of reluctance. It seems to me that the testimony of the accomplice was sufficiently corroborated; that, however, was for this court to decide as a matter of law. The considerations upon which my brethren have decided that the corroboration was insufficient do not entirely convince me. They do create in my mind a reasonable doubt. The law imposes the obligation to resolve every reasonable doubt in favor of the defendant. Therefore, while the corroborating evidence seems to me to be reasonably sufficient to meet the demands of the law, I am yet willing to give the defendant the benefit of the doubt. I therefore join in the direction that a new trial be granted, to the end that the state may produce further corroboration of the accomplice.