STATE, Respondent, *v.* KECKONEN, Appellant.

(No. 7,818.)

(Submitted September 28, 1938. Decided November 16, 1938.)

[84 Pac. (2d) 341.]

Mr. *John B. McClernan*, for Appellant, submitted a brief, and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, and *Mr. John K. Claxton,* County Attorney of Silver Bow County, for the State, submitted a brief; *Mr. Thompson* argued the cause orally.

MR. CHIEF JUSTICE GODDARD delivered the opinion of the court.

Alexander Keckonen was tried and convicted on an information charging him with a violation of section 11030, Revised Codes, which defines the infamous crime against nature. The information also charged him with the prior conviction of a felony—robbery; on this charge, however, no proof was offered, since it was agreed between counsel that this prior conviction would be admitted. He was sentenced to 35 years in the state prison, and it is from that judgment and the order denying a new trial that this appeal is taken.

The only evidence adduced as to the actual commission of the offense is to be found in the testimony of the prosecuting witness, a boy between 16 and 17 years of age, a confessed accomplice in the case. His testimony was substantially as follows: He met defendant in the fall of 1936 near a hamburger shop in the city of Butte, Montana, at which time the latter asked him for something to eat. The boy accommodated, and the next day he met defendant again who thereupon asked him to go with him to his room. The boy accepted and once there, defendant made a proposal to him whereby he, the boy, was induced to become the passive partner in the commission of the crime against nature. The crime was committed in the usual way where two persons of the male sex attempt unnatural intercourse. Defendant's proposal was to pay the boy so much a week in return for his consent and assistance in the perpetration of the act. The boy accepted, and from then on the meetings had by the two for this purpose apparently became almost a daily occurrence for many months prior to the institution of this prosecution.

He testified that shortly after the inception of the criminal relationship, his parents changed their place of residence in Butte at least twice; and that defendant changed his as many times, and always to a vicinity close to where the boy's parents would move in order to be near him. For one period of time, he testified, defendant actually lived in the same building with his parents, they having a downstairs apartment, and defendant having quarters upstairs. His testimony further disclosed that during the latter part of July, 1937, his parents took a trip to the state of Washington at which time he went to live with defendant for two or three weeks, including the 17th of July, 1937, the date of the act charged in the information. The boy's mother testified that on taking this trip, the boy was left to live with his married sister in the city of Butte. On the above-mentioned date at about midnight, two officers of the law in search of the boy who had been reported to the police as missing, discovered him asleep in defendant's room. When found, defendant and the boy were sleeping in separate beds. Both were taken into custody.

The boy's mother testified that she was acquainted with defendant and that she had met him shortly after he moved into the room above the family apartment. She saw him nearly every day, and soon observed that he was very friendly with her boy. As time went on, she thought it did not seem right the way defendant was hanging around her boy all the time. She testified: "They were together all of the time. When I say 'all of the time' I mean almost daily. I wouldn't say daily, but more than what really looked right." The record does not disclose the actual disparity in the ages except that the boy was over 16 and defendant was a "man." She requested defendant to come to the house and at that time she asked him not to give her boy any more money or presents, and particularly a suit of clothes which he had bought and for which she offered to reimburse him. She told defendant that her husband (the boy's stepfather) wished also to see him. In response to a question regarding the boy's physi-

cal condition, she testified that he was getting nervous and wouldn't eat. On cross-examination, she testified that her boy did not associate with his former playmates after having made the acquaintance of defendant. She also testified that at a time subsequent to the conversation she had with defendant concerning the boy, she invited him to their home for Thanksgiving dinner just out of courtesy to the boy. On redirect, she testified that on one occasion she observed defendant waiting at a street corner to meet her boy as he came from school.

The boy's stepfather testified substantially that he had observed the friendliness that existed between defendant and the boy, and knew that they were associating together. He was asked whether he had had a conversation with defendant relative to his associations with his stepson, and in response he testified: ''He came to my house and said we were accusing him with improper relations with the child and I told him it was a fact and didn't think things were right. He said, 'my relations with the boy are purely friendly and I don't mean anything only pure friendship with the boy,' and I said to him, if its pure friendship I hate to break it up as there is such little in the world I hate to be the means of breaking it up. He said it was pure friendship and he wanted to know if we wanted him away from the boy, and I said I did, and I said further, we want you to quit giving him clothes and money.''

On cross-examination he testified: ''After I had that conversation with Mr. Keckonen about his relations with the boy it is true that I saw him with Alex (defendant) after that. I did not accuse Alex of improper relations with the boy after that because there was no use. On Thanksgiving day I went to Mr. Keckonen's apartment and asked him up for Thanksgiving dinner because the boy had asked for it, and he had dinner at our house on Thanksgiving day. After the time of the conversation with Keckonen he came to our home several times with the boy but not as an invited guest.''

The county physician testified that he examined the rectum of the boy 48 hours after he had been incarcerated in the Juve-

nile Detention Room. The examination was made to determine whether there was any evidence that might indicate that a sodomitic relationship had occurred. In substance he testified that his examination revealed a relaxed condition of both the external and internal sphincter muscles. In part, his testimony was this: "In the ordinary individual we find the muscle is taut. That is, it's tight, so that in inserting a foreign body, a finger, there is a certain resistance and you must use considerable force, particularly in a conscious patient where the muscle is active. Now in this instance, the finger required very little force to force its way through both muscles."

The only other evidence offered by the state and admitted by the court was the testimony of the two arresting officers. Their combined testimony disclosed only the fact that they had found the boy and defendant together in the latter's room, sleeping in separate beds at midnight the night of the arrest.

At this point in the trial, counsel for defendant presented an alternative motion to the court requesting it to either dismiss defendant, direct a verdict of acquittal, or to advise the jury to acquit defendant. Five grounds were specified in support of the motion; the court, however, denied the motion *in toto*. With this, defendant rested his case without offering any evidence in his behalf.

The first five specifications of error present the determinative question in this appeal, which is whether or not the state has sufficiently corroborated the testimony of the accomplice in accordance with the requirements of section 11988 Revised Codes. If not, the conviction cannot stand. The section provides as follows: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." This section was adopted from the California Penal Code, and of that section the California court said in a cause

embodying facts somewhat similar to those in the present appeal: "It will thus be seen that the statute imperatively makes corroboration of the testimony of an accomplice an essential prerequisite to the conviction of a defendant where the crime charged rests primarily and solely upon the testimony of an accomplice; and it is apparent, therefore, that the court has no control over the subject except to apply the statute. The court has no discretion in the matter, but is bound to apply the statute indiscriminately to all cases wherever an accomplice appears as a witness, and the state's case depends solely upon his uncorroborated testimony." (*People* v. *Robbins*, 171 Cal. 466, 154 Pac. 317, 318.)

The dictates of the above quotation apply equally as well to us as they do to the California courts, and the boundaries of our review are clearly marked. In this jurisdiction, the question of corroborating an accomplice's testimony has often been before the court. The pronouncements on the subject have been ably crystalized and reviewed in the case of *State* v. *Jones*, 95 Mont. 317, 26 Pac. (2d) 341, and more recently approved in the case of *State* v. *Gaffney*, 106 Mont. 310, 77 Pac. (2d) 398. We think it would needlessly extend this decision to reiterate the controlling rules therein announced and we shall content ourselves here with a review and analysis of the evidence bearing the rules of the Jones case clearly in mind.

It must be conceded that the story told by the accomplice is ▇ most damning, and with the exception of some confusion in the matter of dates, a seemingly plausible and straight one— in fact no motive is suggested from the record why defendant should be falsely accused. The requirement of corroboration must, however, still be met, and as stated in *State* v. *Akers*, 106 Mont. 43, 74 Pac. (2d) 1138, 1143, "After there has been the necessary corroboration of the testimony of an accomplice, the jury may then weigh the entire testimony of the accomplice in order to determine the guilt of the defendant."

Does the evidence exclusive of the accomplice's *tend to connect* defendant with the commission of the offense? Before answering this important question we wish, in the interest of clarification, to elaborate a little upon what, as before noted, has grown into a settled body of law in this jurisdiction on the subject of corroboration of an accomplice's testimony, and more particularly, the meaning of the phrase, "tend to connect." Its literal meaning is clear enough, and in several decisions the word "tend" in connection with the corroboration rule has been defined as follows: "To have a leaning." (*Chandler* v. *State*, 89 Tex. Cr. Rep. 597, 232 S. W. 318.) "To serve, contribute or conduce in some degree or way," or, "have a more or less direct bearing or effect." (*Boone* v. *State*, 90 Tex. Cr. Rep. 374, 235 S. W. 580, 584.) "To be directed as to any end, object or purpose." (*Nash* v. *State*, 61 Tex. Cr. Rep. 259, 134 S. W. 709.) And, in Webster's Dictionary, the word is thus defined: "To be directed or have a tendency, conscious or unconscious to any end, object or purpose."

The word has not been defined apparently in connection with the corroboration rule in any of the Montana criminal cases; however, in *State* v. *Geddes*, 22 Mont. 68, 83, 55 Pac. 919, this court said: "Furthermore, it is not a satisfaction of the statute to corroborate an accomplice upon immaterial matters, or to prove merely that the crime charged has been committed, or the circumstances under which it has been committed; for there may be all such proof, and yet the additional essential evidence be lacking, which, independently of the evidence of the accomplice, leads to the inference that the defendant is connected in a criminal way with the commission of the crime. The statute is conformable to the rule laid down by Rosc. Cr. Ev., p. 122: 'That there should be some fact deposed to, independently altogether of the evidence of the accomplice, which taken by itself leads to the inference, not only that a crime has been committed, but that the prisoner is implicated in it.'" (See, also, to the same effect, *State* v. *Lawson*, 44 Mont. 488, 120 Pac. 808.)

In the case of *Moffett* v. *Bozeman Canning Co.*, 95 Mont. 347, 362, 26 Pac. (2d) 973, Mr. Justice Anderson in a dissenting opinion had occasion to define the term "tend" in connection with the circumstantial evidence rule in a workmen's compensation case. While that was a civil case, we think the definition there given is apt, and by analogy, equally applicable in a criminal prosecution such as this dealing with the accomplice corroboration rule. He there said: "The use of the word 'tends' does not contemplate conjecture. It contemplates the testimony has the tendency to establish the theory which will support claimant's case and not some other theory inconsistent therewith. If the conclusion to be reached from the testimony is equally consonant with some theory inconsistent with the theory of claimant's case, then the circumstantial evidence does not tend to prove his case. (*Shaw* v. *New Year Gold Mines Co.*, supra [31 Mont. 138, 77 Pac. 515].) Any inference drawn from such testimony, however shrewd, is still in the realm of speculation." To the same effect, see *Kern* v. *Payne*, 65 Mont. 325, 331, 211 Pac. 767, and *Winnicott* v. *Orman*, 39 Mont. 339, 349, 102 Pac. 570.

So here, if the conclusion to be reached from the alleged corroborative evidence is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of defendant, then such evidence does not tend to connect him with the commission of the offense, and "any inference drawn from such testimony, however shrewd, is still in the realm of speculation."

We have fully set out the testimony of all the witnesses called by the state. The Attorney General's brief fairly summarizes the independent evidence asserted to furnish the necessary corroboration. Briefly outlined, it is as follows:

1. Medical testimony showing relaxed internal and external sphincter muscles of the boy's anus; examination made 48 hours after incarceration the night of the alleged offense.

2. Mother's testimony that the boy seemed nervous and wouldn't eat (elements showing some connection with someone out of the ordinary).

3. Testimony of both the boy's mother and stepfather showing the continual, almost daily association between defendant and their boy.

4. Mother's testimony that she saw defendant waiting at a street corner on one occasion to meet her boy as he came home from school, and also that he had withdrawn from all his boy companions, thereby having no other associates except defendant.

5. Testimony of the mother and stepfather as to a conversation had with defendant requesting him not to give the boy any more money or presents; and requests, after accusal by stepfather, and denial by defendant of improper relations with the boy, that defendant refrain from further associations with the boy.

6. Testimony of arresting officers as to finding defendant and boy together in the same room in defendant's apartment where the boy admitted he had been staying since his parents had left for Washington for a visit of about three weeks.

7. The additional fact and circumstance that on the various occasions the boy's family would move to a new location in Butte, defendant would also change his place of residence, and always to a location in close proximity to that of the boy's new home.

These facts and circumstances, contends the state, *tended to connect* defendant with the crime of sodomy, and left no room for any inference, by the jury, other than that illicit relations were being carried on as between defendant and the prosecuting witness. We cannot agree. We have examined these alleged corroborations in detail, and cannot see how, singly or in combination, they tend to connect defendant with the commission of the offense charged, or corroborate the boy's testimony except that they show opportunity of defendant to have committed such a crime as the boy described. That is not enough. (*State v. Jones,* supra.) It may be granted also, that the testimony considered as a whole, exclusive of that of the accomplice, does tend to place the defendant under suspicion; however, it must

be remembered that in this jurisdiction—and the rule is too well known to require citation of authority—a defendant cannot be convicted upon conjecture, however shrewd, or suspicion, however well-founded. This rule is but the natural outgrowth of the theory adopted in this country in criminal cases, and codified in section 11971, Revised Codes, which provides: ''A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal.'' And, as said in *People* v. *Robbins,* supra: ''Men are not and should not be convicted of degrading crimes upon mere suspicion plus the story of an accomplice.''

As we view the doctor's testimony, it amounts to no more than evidence relating merely to the ''commission of the offense, or the circumstances thereof.'' Under section 11988, supra, this is not sufficient corroboration. In other words, the jury upon hearing such testimony might well have believed that some foreign body, possibly a man's penis, had caused such condition as the doctor testified. However, for aught that he testified, the condition might well have been caused by something else, and more important and serious still, by someone other than the defendant on trial. See Herzog's Medical Jurisprudence, section 790, pp. 567, 568, in connection with physical examinations in such cases. In connection with the physical act itself, it seems that it might have been possible to have discovered some tangible evidence of the offense charged in the condition of the bedclothes in the beds occupied by defendant and the boy in defendant's room. The record suggests nothing of that sort.

As to the mother's testimony concerning the boy's nervous condition and lack of appetite, human experience has taught that such conditions are not extraordinary or conclusively significant even in boys during their formative years. Furthermore, the record is silent as to how long such a condition existed, making it speculative at best, whether the associations with de-

fendant, of whatever nature, might have in any manner been the cause.

The testimony of both mother and stepfather as to the continuous associations between the defendant and their boy indeed connect defendant with the boy, but from that it does not follow that such testimony tended to connect defendant with the commission of the offense charged. True this association might well have given rise to the opportunity on the part of defendant to have committed the crime charged, but does not that same opportunity present itself whenever two males find themselves together alone, whether they be man and man, or man and boy? The rule is that proof of mere suspicious circumstances and of opportunity to commit a crime are never sufficient to justify a conviction upon the testimony of an accomplice. (*State* v. *Jones,* supra; *People* v. *Robbins,* supra.)

The money given and gifts bestowed upon the boy may have been motivated out of pure friendship on the part of defendant, as testified to by the boy's stepfather in relating his conversation with defendant, or they may have been given in payment for services rendered to defendant in helping him commit the infamous crime. The independent testimony in the record is that they were given out of friendship for the boy, and there is only the accomplice's testimony that money was paid for his assistance in the sodomitic relations. Viewed in the most favorable light to defendant, any inference to be drawn from the bestowal of these gifts is as consistent with innocence as with guilt, and therefore clearly within the condemnation of the corroboration required by the rules reviewed in *State* v. *Jones,* supra.

Defendant was accused outright by the boy's stepfather of improper relations with the boy. This accusation was denied. We see no logical reason why this accusation and denial should be used against the defendant in any inculpatory manner as corroboration of the accomplice's story, any more than would the state's information and the defendant's plea of not guilty. It might be otherwise in the face of evidence showing some in-

criminating reaction on the part of defendant upon being confronted with such a serious accusation. No such evidence is presented here. (See *State* v. *Won*, 76 Mont. 509, 519, 248 Pac. 201; compare, also, 80 A. L. R. 1235.)

The evidence of the police officers disclosed only that defendant and the boy were found together in the same room the night of the crime charged, but in separate beds. Again, the most that can be said of their testimony is that it connected defendant with the boy but did not tend to connect him with the commission of the offense; as discussed before, such circumstances were only suspicious and only gave rise to opportunity.

As to why the boy had no associates other than defendant, as testified to by his mother, is certainly conjectural as is also the reason why defendant, on the one occasion observed by the mother, waited at a street corner to meet the boy as he came from school. Assuming that the reason why the boy had no other associates was that all his spare time was taken up with defendant, still no evidence is of record as to what such time might have been devoted to other than as testified to by the boy—the accomplice in the case. Again, the facts and circumstances and inferences deducible therefrom are only probative of the fact of opportunity. The same can be said of defendant's frequent changes of residence coincidentally made always near to where the boy's parents moved.

There are numerous other assignments of error, disposal of which, we believe, would unnecessarily encumber this record. On a retrial of the case, it is unlikely, in view of our decision, that the questions tendered by the specifications would arise again.

Complaint is made as to the giving of one particular instruction over the objection of defendant. In the form given, it may have been capable of confusing the jury; however, the instructions, taken as a whole, furnished an unusually comprehensive and fair statement of the law applicable and controlling in arriving at a verdict. We fail to see where defendant's rights were prejudiced.

The seriousness of the specifications regarding the admission of certain testimony having to do with the suspicions of third parties, we think, is lost in view of our holding as to the insufficiency of the essential corroboration.

As to the charge that the verdict and sentence were the result of passion and prejudice, there is to some extent, in all fairness to the normal conscience and ordinary behavior of mankind, probably little doubt. Crimes against nature are naturally revolting to a normal person, and the subject is truly a loathsome one. In such cases, jurors are sometimes moved by abhorrence of the offense to convict upon slight evidence. As suggested by counsel for defendant, this fact alone should be enough to put a tribunal assiduously on guard against yielding to the dictates of such intense prejudice. The trial court recognized in one of the instructions given that the charge is one easily made, hard to prove, and still harder to disprove.

We have carefully examined the record in a supreme effort to determine whether the necessary requirements of corroboration of the accomplice's story have been met. For the reasons given, we find that they have not and are, therefore, unable to hold that the independent evidence produced tends to connect defendant with the commission of the crime charged. Compare the following authorities: *People* v. *Robbins,* supra; *People* v. *Singh,* 121 Cal. App. 107, 8 Pac. (2d) 898; *People* v. *Conklin,* 122 Cal. App. 83, 10 Pac. (2d) 98; *People* v. *Galeno,* 25 Cal. App. (2d) 14, 76 Pac. (2d) 187; *State* v. *Pitman,* 98 N. J. L. 626, 121 Atl. 597; *People* v. *Fitzgibbons,* 346 Ill. 338, 179 N. E. 106; *People* v. *Jensen,* 76 Cal. App. 558, 244 Pac. 1086; *People* v. *Khan,* 86 Cal. App. 84, 260 Pac. 391; *People* v. *Knowles,* 75 Cal. App. 229, 242 Pac. 508; *Verhaalen* v. *State,* 195 Wis. 345, 218 N. W. 378; *Means* v. *State,* 125 Wis. 650, 104 N. W. 815; *People* v. *Deschessere,* 69 App. Div. 217, 74 N. Y. Supp. 761; *Kelly* v. *People,* 192 Ill. 119, 61 N. E. 425, 85 Am. St. Rep. 323; *People* v. *Reynolds,* 26 Cal. App. (2d) 219, 79 Pac. (2d) 150; *People* v. *Briley,* 9 Cal. App. (2d) 84, 48 Pac. (2d) 734; *People* v. *Wyett,* 49 Cal. App. 289, 193 Pac. 153.

The only Montana sodomy cases we have been able to find are *Territory* v. *Mahaffey*, 3 Mont. 112; *State* v. *Chandonette*, 10 Mont. 280, 25 Pac. 438, and *State* v. *Guerin*, 51 Mont. 250, 152 Pac. 747. The last two mentioned do not touch the question passed upon in this appeal, but *Territory* v. *Mahaffey* does; however, in so far as the corroboration point is concerned, it is of little value to us as a precedent for the reason that the statutory requirement for corroboration of an accomplice's testimony was more liberal then than it is now.

The judgment is reversed, and the cause remanded to the district court for a new trial.

ASSOCIATE JUSTICES ANDERSON and ANGSTMAN concur.

MR. JUSTICE MORRIS:

I dissent. I think the corroborating evidence is amply sufficient to support the verdict of the jury.

MR. JUSTICE STEWART:

I concur in the foregoing dissent of MR. JUSTICE MORRIS.