No. 14416

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

THE STATE OF MONTANA,

                Plaintiff and Respondent,

    -vs-

ALFRED VERNON OWENS,
a/k/a AL OWENS,

                Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
           Honorable C. B. Sande, Judge presiding.

Counsel of Record:

    For Appellant:

        John L. Adams, Billings, Montana
        Leonard Haxby argued, Butte, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Sheri Sprigg argued, Assistant Attorney General, Helena,
        Montana
        Harold Hanser, County Attorney, Billings, Montana

---

                Submitted: June 5, 1979

                Decided: **JUN** 2 9 1979

Filed: **JUN** 2 9 1979

_Thomas J. Kearney_
                Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Alfred Owens was convicted of the crimes of mitigated deliberate homicide and robbery in the District Court of Yellowstone County following a jury trial. Defendant appeals.

The information charged defendant Alfred Owens and his brother, L. D. Owens, with four counts: Count I charged the codefendants with deliberate homicide committed purposely or knowingly. Alternatively, Count II charged the codefendants with deliberate homicide while engaged in the commission of a felony. Count III charged the codefendants with robbery. Count IV charged the codefendants with aggravated kidnapping.

L. D. Owens pleaded guilty to Counts II and III. Counts I and IV were dismissed as to him.

Commencing May 8, 1978, defendant Alfred Owens was tried. The jury found him guilty of mitigated deliberate homicide, a lesser included offense of Counts I and II, and of robbery. It found him not guilty of aggravated kidnapping.

On June 14, 1978, defendant was sentenced. Some confusion resulted, as the court minutes state defendant was sentenced to 40 years on each count to run consecutively, while the judgment states the sentences are to run concurrently.

Defendant Alfred Owens appeals.

The facts leading to this appeal are as follows.

In late 1977 defendant Alfred Owens, his older brother, L. D. Owens, and his brother's girlfriend, Betty Shipes, left California heading for Texas. By a circuitous route,

the trio arrived in Laurel, Montana, in the afternoon of November 27, 1977, and rented a motel room.

Sometime during the afternoon of their arrival, defendant, accompanied by his brother, purchased and signed for a box of .410 shotgun shells, ostensibly to do some bird hunting and target shooting. Neither defendant nor his brother purchased a hunting license. After dropping Shipes off at a laundromat near the motel, defendant and L. D. went to town where they started drinking in various bars. About midnight, defendant, who estimated he had drunk a case of beer during the day, returned to the motel room to go to bed. L. D., after accompanying defendant back to the room, left again to go eat breakfast.

While out this second time, L. D. met Kenneth Olson and subsequently invited him back to the motel. Once there, after a short conversation, L. D. decided to rob Olson, and drew the shotgun on him. Apparently, it was the sound of L. D. loading the gun that woke defendant.

During the robbery Shipes, who was feigning sleep, heard defendant tell Olson that he had better do what L. D. said. After emptying Olson's pockets, L. D., defendant, and Olson left the motel room. There is some dispute over whether L. D. ordered defendant to accompany him or threatened him in any manner. According to Shipes, however, L. D. did not threaten defendant in any manner and merely said "let's go" before all three left.

The three left the motel room and got into Shipes' car. Defendant was driving with Olson on the front seat next to him and L. D. in the back holding the shotgun. Although L. D. initially indicated that he intended only to take Olson out somewhere and tie him up, defendant conceded that it soon became clear that L. D. intended to kill Olson.

-3-

After a running argument between defendant and L. D. while driving into the country, defendant stopped the car, got out, and began walking back to town. L. D. then drove the car a short distance, still holding the shotgun on Olson in the front seat next to him. L. D. then ordered Olson to get out of the car and to lie face down on the ground, and then shot him at least twice. Olson, shot in the back of the head and lower back, died within minutes.

L. D. turned the car around and on his way back into town picked up defendant. It is disputed whether, after L. D. had picked him up, defendant handed L. D. another shell, saying that they should shoot Olson again to be sure.

It is also disputed as to what happened next. Both defendant's and L. D.'s testimony at trial was internally contradictory and tended to be illogical in positing the next sequence of events. According to the reading of that testimony most favorable to defendant, he dropped L. D. off downtown where the latter got Olson's vehicle and drove it to the Yellowstone River. After ransacking the vehicle and stashing the stolen goods under some bushes, L. D. then drove it into the river and walked back to the motel. Upon arriving at the motel, L. D. got Shipes' car, drove back to the river alone, and packed the stolen goods in the trunk. He then returned to the motel where he met defendant who had been out walking to clear his head.

According to the testimony of the police officer arresting defendant, however, defendant told him that he had followed L. D. out to the river where they had both ransacked Olson's truck and then returned to the motel. L. D. too testified at trial (and in an earlier statement) that defendant helped ransack Olson's vehicle. As noted, both

L. D.'s and defendant's testimony at trial tended to be unclear as to defendant's role in ransacking Olson's truck, especially on such points as L. D. walking the one and one-half or two miles back to town from the site where he drove the vehicle into the river, and how L. D. managed to drive Shipes' car back to pick up the goods when apparently defendant had one set of keys with him and Shipes had the other set in her purse.

In any event, both L. D. and defendant returned at the same time to the motel where they and Shipes packed up and left town, headed for Texas. En route, according to Shipes, defendant dictated to her a list of the rifles taken from Olson's truck which she took down on her California motor vehicle code book. This book was eventually introduced into evidence. Shipes further testified that defendant and L. D. periodically discussed the incident after they had left Montana.

Along the way the parties apparently pawned or sold various rifles and other items taken from Olson's truck. Although defendant denied that he received any money from the sale of these items, he did concede "the money went into the gas tank and such as that." Defendant also admitted he wore Olson's wristwatch which L. D. had given him. The three stayed together until Kansas where, after L. D. and defendant had an argument, defendant separated from L. D. and Shipes. Significantly, Shipes testified that the reason defendant gave her for leaving was that he (defendant) was afraid he would hurt L. D.

Eventually L. D. was arrested in Texas and gave a statement implicating defendant, in order, he said at trial, to keep Shipes from incarceration. In this statement, which

was used at trial to impeach his testimony, L. D. stated that defendant had, in fact, accompanied L. D. and Olson to the spot where the latter was shot and had ordered Olson to lie down just before L. D. shot him. L. D. further stated that while he, defendant, and Olson were driving out to the country, he and defendant had robbed Olson again, apparently getting his rings and watch. Shipes, incidentally, was never charged in this matter.

Defendant was subsequently arrested in Tucson, Arizona, where he too gave a statement to authorities as noted above.

Upon their return to Montana, L. D. Owens pleaded guilty to charges of deliberate homicide and robbery and received a sentence of 140 years. Defendant Alfred Owens was tried and found guilty of mitigated deliberate homicide and robbery and received a sentence of 40 years on each count. Because of a conflict between the court minute entry and the judgment, it is unclear as to whether these sentences are to run consecutively or concurrently.

Defendant appeals.

The issues presented for review are:

1. Was there sufficient corroboration of the testimony of L. D. Owens to connect defendant to the commission of the crimes?

2. Did the District Court admit improper hearsay testimony?

3. Was the District Court's refusal of defendant's offered instruction concerning compulsion reversible error?

4. Was the District Court's refusal of defendant's offered instruction concerning accountability reversible error?

5. Did the District Court sentence defendant to two forty-year terms to run consecutively or concurrently?

Defendant's first issue concerns the requirement that the testimony of an accomplice in a criminal act must be corroborated by other independent testimony or evidence which connects the defendant to the commission of the crime before the defendant can be convicted of the crime. This requirement is codified as section 95-3012, R.C.M. 1947, now section 46-16-213 MCA:

> "A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in 94-2-106, unless the testimony is corroborated by other evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Defendant's argument basically is that there was no evidence, other than the testimony of L. D. Owens, his convicted accomplice, to connect him to the commission of the offenses for which he was convicted. We disagree.

We discussed the nature and quality of the required corroborative evidence in State v. Coleman (1978), _____ Mont. _____, 579 P.2d 732, 748, 35 St.Rep. 560, 576-77:

> "The rule on corroboration is stated in State v. Cobb (1926), 76 Mont. 89, 245 P. 265. In that case, we held that the corroborating evidence may be supplied by the defendant or his witnesses; it may be circumstantial evidence; it need not be sufficient to sustain a conviction or establish a prima facie case of guilt; and it need not be sufficient to connect the defendant with the crime but must tend to connect him with the crime. In State v. Keckonen (1938), 107 Mont. 253, 84 P.2d 341, we held that where the alleged corrobative evidence is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of defendant, then such evidence does not tend to connect him with the commission of the offense and is in the realm

of speculation, not corroboration. Where the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corroboration to justify a conviction upon the testimony of an accomplice. State v. Jones (1933), 95 Mont. 317, 26 P.2d 341."

Applying these rules, we conclude that the corroborating evidence presented at trial is sufficient to sustain defendant's conviction.

From Brenda Dennis, a clerk in a store in Laurel, the jury heard that on the afternoon before Olson was killed, defendant purchased and signed for a box of .410 shotgun shells of the type used to kill Olson. Defendant's argument that the lack of defendant's fingerprints on the shells found at the murder scene eliminates any corroborative value is completely unpersuasive. L. D.'s fingerprints were not found on these shells either, yet he admitted that he had used them to kill Olson.

From Betty Shipes, who was not an accomplice to the crimes, the jury heard that the defendant instructed Olson to do as L. D. directed during the robbery in the motel room; that defendant made no attempt to stop L. D. from robbing Olson; and that L. D. never threatened or ordered defendant to assist him in the robbery. Shipes also testified that she heard defendant, L. D., and Olson leave the motel together; that only L. D. and defendant returned, again together; and that upon their return, the party hastily packed up and left town. She further testified that, after the group had left town, defendant dictated to her a list of weapons that had been taken from Olson's vehicle.

From Robert Lough, the police officer who arrested defendant in Arizona, the jury heard during the State's re-

-8-

buttal that defendant had admitted that he had aided L. D. in robbing the victim in the motel room and that he had left the scene of the homicide only because he believed it was an inappropriate place as he thought they had stopped in someone's driveway, not because he necessarily believed the act itself was wrong. Lough further testified that defendant stated to him that he had helped ransack and dispose of Olson's vehicle and that he had himself sold one of the shotguns taken from Olson's vehicle.

Finally, from defendant himself, the jury heard that he did purchase the shotgun shells used to kill Olson. Defendant also admitted that during the robbery of Olson in the motel room, he had told Olson to do as L. D. directed. Defendant testified that he drove L. D. and Olson out into the country almost to the site where Olson was killed; that after hearing Olson being shot, he drove L. D. back into town; and that later he, L. D. and Shipes packed up hurriedly and left town. Although defendant denied receiving any spoils from the robbery, he did concede that the money received from the sale of the stolen items financed the group's journey toward Texas and that, after the group had left Montana, he was given Olson's wristwatch by L. D.

A person may be convicted of deliberate homicide if such homicide "is committed while the offender is . . . an accomplice in the commission of . . . or flight after committing . . . any other felony which involves the use or threat of physical force or violence against any individual." Section 94-5-102(1)(b), R.C.M. 1947, now section 45-5-102 MCA.

Clearly, this evidence tends to connect defendant with the commission of the offenses of robbery and homicide as a

participant in the actual robbery and as an accomplice in the commission of and flight after the deliberate homicide of Kenneth Olson after the robbery.

The second issue presented for review concerns the introduction through the testimony of one witness of a prior inconsistent statement made by another witness. The State correctly states that, as defendant made no objection at trial to the introduction of any of the testimony he now claims was improperly admitted hearsay, he is barred from predicating error on its admission on appeal, and therefore this Court need not consider the issue. Rule 103(a)(1), Mont.R.Evid.; State v. Armstrong (1977), ____ Mont. _____, 562 P.2d 1129, 1132, 34 St.Rep. 213, 216. In a recent case presenting very similar circumstances, we stated:

> ". . . At any rate, defendants never objected to Wicks' testifying to the Peterson statement nor did they move to strike it from the record. They may not now object to its introduction." State v. Cripps (1978), ___ Mont. ___, 582 P.2d 312, 317, 35 St.Rep. 967, 972.

The same rule applies to the instant case. In any event, were we to examine defendant's contention on the merits, our ultimate conclusion would be unchanged. See State v. Longacre (1975), 168 Mont. 311, 312, 542 P.2d 1221, 1222; State v. Mally (1961), 139 Mont. 599, 609, 366 P.2d 868, 873.

The third issue presented for review concerns the refusal of the District Court to give defendant's requested instruction on the defense of compulsion which read:

> "You are instructed that a person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or serious bodily harm, if he reasonably believes that death or serious bodily harm will be inflicted upon him if he does not perform such conduct."

Defendant is correct in stating that where there is evidence in support of any defense offered by an accused which raises an issue of fact favorable to him, the trial court should present the issue by an affirmative instruction which explains the pertinent law.  State v. Azure (1977), ___ Mont. ____, 573 P.2d 179, 182, 34 St.Rep. 1569, 1573.  However, "[w]here there is no evidence in the record supporting each element of the [compulsion] defense, the court may properly refuse to instruct the jury on the defense."  State v. Gallagher (1978), ____ Mont. _____, 580 P.2d 930, 935, 35 St.Rep. 848, 855.  (Emphasis added.)

The elements of the compulsion defense are found in section 94-3-110, R.C.M. 1947, now section 45-2-212 MCA.  Under that statute, for a defendant to avail himself of the defense of compulsion, he must show that:  (1) he was compelled to perform the offensive conduct (2) by the threat or menace (3) of the imminent infliction (4) of death or serious bodily harm, and that (5) he believed that death or serious bodily harm would be inflicted upon him if he did not perform such conduct, and (6) his belief was reasonable.

We have examined the trial transcript and conclude that defendant failed to produce evidence in support of several of these elements.  There was absolutely no testimony that L. D. Owens threatened defendant at any time with the imminent infliction of death or serious bodily harm; defendant did not testify he believed his older brother would have shot him had he refused to comply with his directions.  L. D.'s statement when he, defendant, and Olson left the motel room, according to Betty Shipes, was simply "let's go."  Prior to that time, defendant himself had directed Olson to comply with L. D.'s orders, doing so under absolutely no threat from L. D.

-11-

Although defendant contends that during the drive out to Olson's execution site L. D. repeatedly told defendant to be quiet and keep driving, he admitted that L. D. never pointed the shotgun at him. Defendant eventually got out of the car and started walking back to town, apparently without fear of any physical harm. Shortly thereafter, he voluntarily got back into the car and drove L. D. back to Laurel where he allegedly dropped him off to pick up Olson's vehicle. After this point, defendant had the shotgun in his possession in Shipes' car and L. D. was not around. Yet defendant failed to inform any authorities as to the incident involving Olson and in fact voluntarily continued his association with L. D. by helping him pack up and then leaving town with him. These are hardly the actions of a person who has just been compelled to perform an odious criminal act by the threat of imminent infliction of serious bodily harm or death. In fact, it appears from defendant's testimony that he was more frightened of the situation because he had never participated in anything like it before rather than of anything L. D. might have done. Indeed, it appears that defendant was not afraid of L. D. at all--the reason he left L. D. and Shipes in Kansas was that he was afraid that <u>he</u> might end up hurting L. D.

The compulsion defense is a narrow defense. As the Commission Comment to section 94-3-110 states:

> "The justification does not extend to action under threat of damage to property, or of injury less than serious bodily harm or even of death or serious bodily harm which is not imminent; but the person's reasonable fear of imminent death or serious bodily harm if mistaken, is within the principle. (See 1 Bishop on Criminal Law (9th ed.) ¶¶346 to 348.)

"This established type of formulation has been criticized. However, to broaden the defense to accord completely with the 'free will' theory would be to invite routine contentions of some kind of pressure, such as 'threats of harm to property, reputation, health, general safety, and to acts done under the orders,' with accompanying assertion of individual personality weakness. (Newman and Weitzer, supra, at 334.) Prof. Wharton, after stating the established restrictions upon the defense, comments: 'It would be a most dangerous rule if a defendant could shield himself from prosecution for crime by merely setting up a fear from or because of threat of a third person.' (1 Wharton's Criminal Law (19th ed.), ¶384.)"

Defendant failed to introduce any evidence that he feared the imminent infliction of death or serious bodily injury or that he reasonably believed that, if he failed to do as L. D. directed, such injury or death would be inflicted. The proposed instruction was properly refused.

The fourth issue for review concerns the District Court's refusal to give defendant's proposed instruction on accountability which stated:

"You are instructed that some evidence has been introduced tending to show that a person other than the defendant, Alfred Owens, is responsible for the crimes here charged. If, after a consideration of all the evidence, there remains in your minds a reasonable doubt as to who is responsible for the crimes, then it is your duty to acquit."

The trial court did give the following instruction:

"You are instructed that a person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such person in the planning or commission of the offense."

Sections 94-2-106 and 94-2-107, R.C.M. 1947, now sections 45-2-301 and 45-2-302 MCA, the statutes on accountability, state in pertinent part:

"94-2-106. Accountability for conduct of another. A person is responsible for conduct which is an element of an offense, if the conduct is either

-13-

that of the person himself, or that of another and he is legally accountable for such conduct as provided in section 94-2-107, or both.

"94-2-107. <u>When accountability exists</u>. A person is legally accountable for the conduct of another when:

". . .

"(3) either before or during the commission of an offense, and with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

From a comparison of the statutes with defendant's proposed instruction, it is clear that the proposed instruction is an incorrect statement of the law. It creates the distinct impression that the defendant could not be held responsible for the crimes charged if somebody else actually performed the offensive conduct. This is contrary to the statute and has been rejected by this Court at least since 1914. State v. Chevigny (1914), 48 Mont. 382, 385-86, 138 P. 257, 258. The law on accountability was correctly presented in the given instruction. Defendant's proposed instruction was properly refused.

The last issue presented for review is not really an issue at all. The State concedes that the two forty-year sentences given defendant are to run concurrently as specified in the judgment rather than consecutively as stated in the minute book entry. Absent special circumstances indicating otherwise, the final formal judgment as entered by the trial court controls over an inconsistent minute entry. See, section 95-2404, R.C.M. 1947, now section 46-20-104 MCA; State v. Herndon (1965), 1 Ariz.App. 180, 400 P.2d 851, 852.

The judgment of the District Court is affirmed.

_____
Chief Justice

-14-

We concur:

_Gene B Daly_

_John Conway Harrison_

_Daniel J. Shea_

_John C. Sheehy_
Justices