STATE, Respondent, *v.* DESCHAMPS, Appellant.

No. 8610

Submitted April 8, 1946. Decided April 18, 1946.

168 Pac. (2d) 335

Mr. Mark H. Derr, of Polson, for appellant.

Mr. T. R. Delaney, of Polson, Mr. R. V. Bottomly, Atty. Gen., and Mr. Fred Lay, Asst. Atty. Gen., for respondent.

MR. JUSTICE CHEADLE delivered the opinion of the court.

Appeal from a conviction of grand larceny.

The amended information charges that: "The said Joseph Marion Deschamps, on or about the 4th day of February, 1945, at the county of Lake, in the State of Montana, did wilfully, wrongfully and unlawfully and feloniously take, steal and drive away from in front of the residence of one Jesse Couture, at Arlee, Montana, one certain automobile, to-wit: a 1941 ½ T. Chevrolet Pick-up of the value of approximately $1000.00, said Pick-up being the property of Jesse Couture, with the intent in him, the said defendant, to appropriate the same to his own use, and to deprive the true owner thereof."

Appellant assigns error of the trial court in denying defendant's motion to dismiss at the conclusion of the state's case; in denying defendant's motion for a new trial; and in refusing to give defendant's offered instructions 7 and 8, hereinafter particularly referred to.

Defendant's motion to dismiss is based upon the ground "That the State has wholly failed to prove the charge mentioned in the information, or any crime at all, and the evidence is insufficient." The motion for a new trial was based upon seven stated grounds, but since no showing was made with respect to three of these, only the following will be considered; viz.: 1. That the court misdirected the jury in a matter of law. 2. That the court erred in a decision of question of law arising during the course of the trial. 3. That the verdict was contrary to the law and the evidence. It thus appears that the material questions for determination are, first, was the evidence sufficient to support the verdict, and, secondly, did the trial court err in refusing defendant's offered instructions 7 and 8.

Summarized, the evidence shows that on February 3, 1945, the defendant, an Indian, proceeded by bus from St. Ignatius,

near his home, to Missoula, for the purpose of securing employment. There he indulged in considerable drinking, and apparently early the next morning met one Joe Finley, also an Indian, and continued drinking. In an automobile, apparently stolen by Finley at Missoula, the pair proceeded north into Lake County, where the automobile was wrecked. The two continued on foot, and were picked up by Mr. C. H. Papenfus, who transported them to Arlee, in Lake County. Papenfus, and the three passengers in his automobile, recognized the defendant, but not Finley. It was at Arlee that the automobile involved in this action is alleged to have been stolen from the premises of its owner, one Jesse W. Couture. Ownership and identification of the car were satisfactorily established, and are not in question. The evidence as to whether the defendant or Finley took the car from Couture's premises, is conflicting, each accusing the other. The defendant testified in that respect:

"Q. When you got to Arlee, what was done? A. He [Finley] told me he had a car there that his grandfather lived there and he had a car there and he would get that and bring me home.

"Q. Did he do it? A. Yes, he took me to Hot Springs.

"Q. Why didn't you get off at Ravalli? A. I was drunk and went to sleep.

"Q. You didn't take that car at Arlee? A. No.

"Q. You didn't know that was a stolen car? A. No.

"Q. What did you say Finley told you at Arlee? A. He told me he had another car there.

"Q. What was done? A. He said, 'We will get something to drink there and get off there'. If it wasn't for that, I could have rode to the Mission. I live eight miles north of the Mission.

"Q. Did you get in this car? A. Yes, I guess I did.

"Q. Where did you drive to? Where did Finley drive you to? A. Somewhere down close to Hot Springs.

"Q. Then what happened? A. I guess we had a little chewing match. I kind of sobered up a little and found out I was broke and my overshoes gone.

"Q. What was this quarrel over? A. I suppose it must have been over that. I was mad about my overshoes.

"Q. Then what happened? A. He left then. He went out somewheres. He told me afterward he went out and laid down in the field.

"Q. What did you do? A. I drove this car on to this man's place, and I thought I would get back off towards Ravalli. * * * I thought I would get some gas and some money and get back home. I knew the car didn't belong to me. I thought it was his. I was kind of rumdum when I woke up. I knew it wasn't my car. * * * I didn't know that car was stolen."

With respect to this question, Finley, a witness for the state, testified:

"Q. How did you get out of Arlee? A. In a pickup.

"Q. Who was driving? A. Marion [the defendant] was.

"Q. When did he get into it? A. After he had got it.

"Q. Did you see him take it? A. No.

"Q. Where were you when you got into it? A. I was out on the road. * * *

"Q. Did anyone invite you into that pickup? A. Marion did.

"Q. Where did you go from Dixon? A. I was sleeping until we ran into the ditch down by Magpie.

"Q. Who ran into the ditch? A. Marion did.

"Q. Was he driving the truck at that time? A. Yes.

"Q. Were you driving at any time? A. I got it out of the ditch and drove it from there.

"Q. How far did you drive? A. I drove it up to where I got off.

"Q. Was Marion Deschamps in the truck with you? A. Yes.

"Q. Did he tell you whose it was? A. It was supposed to have been some friend of his.

"Q. Did he tell you that? A. That's right."

Jesse Couture testified as to his ownership and the identity of the automobile in question, and that he had never given de-

fendant permission to use it; that the car disappeared from his premises in Arlee during the night of February 3-4, 1945. With reference to a conversation with the defendant at Hot Springs in the evening of February 4th, he testified:

"Q. Tell us what was said. A. We talked about it. He finally admitted he had it, but it was out of town. That he had a flat tire."

Testimony of the witnesses McDonald, Allen and Radcliffe ▇ established that the defendant was in possession of the Couture pickup on the afternoon of February 4th, and that he left it at the Radcliffe place, two and one-half miles southeast of Hot Springs. While the evidence as to the actual taking of the automobile was conflicting, it amply sustained the jury's finding that it was taken, as alleged, by the defendant, especially in view of the uncontroverted fact that it was in defendant's exclusive possession subsequent to its removal from Arlee. It follows that the court was correct in denying defendant's motion for dismissal and motion for a new trial, insofar as based upon insufficiency of the evidence.

By specification 3, the defendant assigns error by the trial court's refusal to give his offered instruction 8 as follows:

"You are instructed that the test of law for you in applying the facts is to ask yourself the question: Did the defendant permanently intend to take the property, or did he deprive the owner of it only temporarily and intend to so do; and if you find the latter situation, that is, that the defendant took the automobile and intended to deprive its owner of the same only temporarily, then your verdict must be for the defendant."

Without determining the correctness of the instruction proposed, the point sought to be covered was correctly and adequately included in instructions given. Thus the jury was instructed by Number 10: "You are instructed that the information charges that the defendant on or about the 4th day of February, 1945, did wilfully, wrongfully, unlawfully and feloniously take, steal and drive away a certain automobile of Jesse Couture from a specified place, and unless you find that

the defendant did take, steal and drive away said automobile with a wilful and felonious intent to steal the same, and find such facts beyond a reasonable doubt, you must acquit the defendant.''

Instruction 12 was as follows:

''You are instructed that if the defendant did not drive, take and steal said automobile with the felonious intention to do so, even though you find that he had knowledge of its theft, or if someone other than he did steal the same, that fact alone is not sufficient for you to convict him.''

Instruction 4 was as follows:

''You are instructed that in the crime of larceny there must be union or joint operation of act and intent. The fact that the taking may have been wrongful is not enough. There must have been a criminal intent—the intention to steal the car, without which the act of taking, however reprehensible and wrongful, amounts only to a trespass or a civil wrong.''

We think it safe to presume that the jury applied to the word ''steal'' its generally understood and accepted meaning. It is true that no instruction defining the word ''steal'' was given, but, since none was requested, such failure will not be held as error. As is said in Pearce v. State, 32 Okl. Cr. 273, 243 Pac. 761, 762: ''To 'steal' anything ordinarily needs no explanation. The term itself imports a wrongful taking and appropriation of the property of another to the taker's own use and benefit. The giving of such definition is unnecessary where it is not requested. The instruction given sufficiently apprised the jury of the nature of the crime charged and of the proof required to support the charge.'' (Citing authorities.) There is nothing in the record here to even suggest that the defendant intended to return the automobile to its owner; to the contrary, the defendant's own testimony establishes his intention of continuing his journey, in the car, away from the place from which it was removed.

Specification of error 3 is based upon the court's refusal to give the following proposed instruction:

"You are instructed that, where the evidence shows two equal hypotheses, one of guilt and one of innocence, you must be-[lieve] that of innocence and find the defendant not guilty."

Giving this its apparent, although unexpressed meaning, we hold that its substance was included in the instructions given by the trial court. No prejudice resulted from the refusal to give the instructions requested; they would have been merely repetitious.

The trial court is to be commended for its fairness to the defendant in the conduct of the trial. The instructions, we think, were eminently fair and correct. These properly advised the jury that the unexplained possession of stolen property alone does not justify the presumption that the possessor is guilty of larceny. They also correctly advised the jury on the circumstantial evidence rule, the rule governing the effect of testimony of an accomplice, and the consideration to be given the fact of intoxication of the accused at the time of commission of the act charged.

Appellant, in support of his contention of insufficiency of the evidence, argues that the witness Finley was an accomplice, and that testimony of other witnesses does not alone tend to connect defendant with commission of the offense charged. The word "accomplice" is thus defined in State v. Smith, 75 Mont. 22, 241 Pac. 522, 523: " 'To constitute a witness for the state an 'accomplice' he must have entertained a criminal intent common 'with that which moved the defendant to commit the crime with which he stood charged, or, not having been present at its commission, must have advised and encouraged it.' State v. Slothower, 56 Mont. 230, 182 Pac. 270; State ex rel. Webb v. District Court, 37 Mont. 191, 95 Pac. 593, 15 Ann. Cas. 743. Mere presence, acquiescence or silence, in the absence of a duty to act, is not enough, no matter how reprehensible it may be, to constitute one an accomplice."

Here, no request for an instruction defining "accomplice" was made of the trial court. Even conceding that the jury might have found that the witness Finley was an accomplice—

and the question is one for the jury (State v. Smith, supra)—the corroborating evidence was sufficient to sustain the conviction, under the rule. As is said in the Smith case: "Even conceding that Williams was an accomplice, the evidence was amply sufficient to justify a conviction under the well-known rule as to corroboration, to-wit, the corroboration is sufficient if 'unaided by the testimony of the accomplice, it tends to connect the defendant with the commission of the offense.' " And see State v. Jones, 95 Mont. 317, 26 Pac. (2d) 341. Obviously here the corroboration is sufficient to tend to connect the defendant with the offense charged. Indeed, the defendant's own testimony is sufficient for such purpose.

Appellant also argues that, because the witness Finley admitted that he had previously been convicted of felonies, and of evidence that his reputation for veracity was bad, his testimony was not credible. This was a matter for consideration by the jury in weighing the evidence, a function which cannot be assumed by this court.

We have studied the record with care in order to satisfy ourselves that the defendant was given a fair trial and every protection afforded by law. While we, had we been jurors, might have arrived at a different result, we must hold that the verdict was supported by substantial evidence, and sufficient, if believed, to warrant the jury's finding of proof of defendant's guilt beyond a reasonable doubt.

The trial court was not in error as to the matters specified. The judgment is accordingly affirmed.

Mr. Chief Justice Lindquist and Associate Justices Morris, Adair and Angstman concur.