STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
THOMAS HENRY HARMON, DEFENDANT AND APPELLANT.
No. 9959.
Submitted January 22, 1959. Decided June 1, 1959.
340 Pac. (2d) 128.

MR. JUSTICES BOTTOMLY and ADAIR dissented.

James E. Purcell, Butte, for appellant.

Forrest H. Anderson, Atty. Gen., James A. Robischon, Asst. Atty. Gen., James A. Robischon, Asst. Atty. Gen., and Robert J. Holland, Butte, for respondent.

THE HONORABLE LESTER H. LOBLE, District Judge, sitting in place of MR. CHIEF JUSTICE HARRISON, delivered the Opinion of the Court.

Defendant was found guilty of first degree burglary committed in Butte, Silver Bow County, Montana, on or about the

13th day of February 1957. He was sentenced to ten years confinement in the state penitentiary at Deer Lodge, Montana. A prior conviction was charged in the information and at the trial it was proved that defendant had previously served a five year sentence in the same prison on a plea of guilty to a like offense.

## The Plea.

Defendant pleaded not guilty, requested counsel, did not testify, invoked the rule of exclusion, introduced no testimony, but at the close of the state's case asked dismissal for lack of evidence and failure to prove burglary as charged. Motion was denied.

## The Verdict.

Following the verdict, defendant moved for a new trial on the ground that the verdict was contrary to the law and the evidence. Defendant appeals from the judgment, specifying error in that the trial court refused to grant his "motion for dismissal," and refused to grant him a new trial.

## The Facts.

Defendant was convicted on the testimony of an accomplice, corroborated by circumstantial evidence. Sufficiency of corroboration is the sole question presented on appeal.

The facts testified to by Carter, a Negro and the accomplice, are these: Thomas Henry Harmon, the defendant and a white man, and the witness had been acquainted about eight years. They met in the state penitentiary at Deer Lodge, Montana. When Harmon was released does not appear, but the witness had been released from Deer Lodge only two days before the present crime was committed.

A third person, Keith McMann, acted as a lookout, shared the loot and was arrested the next day with Harmon and Carter. McMann did not testify and does not otherwise figure in Harmon's trial and appeal.

The victim was Malcolm L. Ferns, a cripple who had lost a leg and walks on crutches, a pensioner living on a meager social security disability income. At the time of the burglary, Ferns

resided in apartment No. 16 of a Butte rooming house located at 209 Colorado Street, apparently alone. It was Ferns' custom to convert his monthly disability payment into traveler's checks as soon as he received it.

The loot was four uncountersigned American Express Company traveler's checks, one $10 bill and one $5 bill and less than $5 in silver and change. All this was removed by Harmon, according to Carter, in the burglary of Ferns' room. The checks were immediately passed by Harmon to Carter. The next day Carter forged Ferns' countersignature and cashed three of the checks to buy merchandise for Harmon, himself and McMann. The fourth check was lost or discarded and was found in the street.

On the night of February 13-14, 1957, Ferns was drinking in various Butte bars, among others the Silver Dollar and the Oasis. During the same evening Harmon and Carter were in Butte, and in and out of the Silver Dollar Bar until closing time. Comparatively few Negroes reside in Butte, and the presence of Harmon and Carter together was noticed. Ferns was in the Silver Dollar early in the evening and from there was helped across the street to the Oasis Bar by two "Good Samaritans," not otherwise identified.

In the Oasis, Ferns cashed one of his remaining $20 traveler's checks, "timbered" (paid cash) "across the plank" (the bar top) for drinks for the house and laid his checks and money out on the bar, and he also bought a bottle of wine to take home against the chill of the February night. Harmon was seated around the elbow of "the plank," two or three stools away, obviously sizing up the situation.

From the Oasis, Ferns went home by taxi and to bed. He picked up his checks and money. Harmon finished his drink and in about twenty minutes drifted across to the Silver Dollar. There he invited Carter to join him in a burglary. The time was only about 11:00 o'clock and Harmon cautioned they must wait a while. About midnight, Harmon, Carter, and McMann proceeded to Ferns room, a few blocks away. McMann

waited outside as a lookout. Carter stood in the hallway just outside Ferns' room door.

Using a "loid" (strip of celluloid, a common burglary tool) Harmon, according to Carter, compressed the spring on the door lock, worked back the latch, entered Ferns' room, turned on the light and took Ferns' checks and money. Ferns slept on.

When Ferns awoke the next morning, he called the Oasis and asked if the swamper had found his checks. When told that "nothing was on the back bar," and that no money had been found when the floor had been cleaned, Ferns stopped payment on the checks and reported them to the police as lost.

Harmon, according to Carter, had removed the checks and money, but had immediately passed the checks to Carter. At the trial, Carter emphasized that he had not entered the room and that Harmon had not entered any store with Carter to cash any of the stolen traveler's checks.

Outside, Carter tore the traveler's checks from the book and threw the cover down on the street. Then the three men returned to the Silver Dollar Bar, split the currency and ordered a fresh round of drinks.

Either as they were returning from Ferns' room or some time later during the night, Carter or one of the others lost or threw away one of the uncountersigned traveler's checks. It was found in the morning not far from Ferns, rooming house by two women walking to a church meeting. These women assumed the check had been lost, but when they saw Ferns' name in a burglary story in the afternoon Butte paper, they turned the check over to the police. By then Harmon and Carter (McMann's disposition is not shown) were already back in jail.

Legal closing time for bars in Montana is 2:00 a.m. At 2:30 a.m. Harmon was picked up again in the neighborhood of Ferns' rooming house, by night police answering a prowler call. He was searched and booked as a drunk, but was released in the morning when the woman who had reported a prowler could not identify him. The officers noticed that Harmon was carry-

ing a small pocket flashlight and two celluloid strips of the kind commonly used by burglars, one of the strips having a blue marking band. Carter volunteered that he had sent a taxicab around to the city jail in the morning for Harmon, but Harmon had already been turned out.

Harmon, Carter and McMann were arrested before noon on the complaint of a Butte haberdasher from whom Carter bought a hat for Harmon paying for it with one of Ferns' traveler's checks to which Carter crudely forged Ferns' countersignature. When arrested, Carter had a wrist watch which he had just bought in another Butte store, using two other of Ferns' checks. While Carter shopped, Harmon and McMann waited at the curb in the Cadillac the three were driving, but the two white men with the Negro had been seen together cruising the Butte winter streets by too many Butte citizens that morning not to have escaped suspicion. When arrested, Harmon was wearing the newly purchased hat and had the two celluloid strips still in his coat pocket, one being a strip with the blue band. The police soon found the cover for Ferns' book of traveler's checks in the street where Carter told the police they would find it.

Briefly summarizing the corroborated evidence against the defendant Harmon, it may be seen that:

1. The accused was in the victim's presence when Ferns "timbered" at the Oasis Bar.

2. The accused was in position to learn the location of the victim's room from the address Ferns gave the taxicab driver (assuming the accused did not already know it).

3. Each time the accused was arrested he was carrying two "loids," one with a blue mark; several police officers saw these at the time of each arrest; the accomplice testified the accused used a "loid" and carried two, one with a blue mark.

4. The accomplice said he threw Ferns' check book cover down in the street. The police found it where the accomplice said he had thrown it. The two women found the fourth check in the same neighborhood.

5. The accused and the accomplice were together in various

Butte bars before and after the time of the burglary; also they were together on the shopping expedition the following day.

6. The accomplice said he forged Ferns' countersignature to two of Ferns' checks to buy a wrist watch. When the accomplice was arrested he had the wrist watch.

7. The accomplice said he used another of Ferns' traveler's checks to buy the accused a hat. When arrested the accused, Harmon, was wearing the hat.

8. The accomplice and the accused, and McMann, were together during the morning of their arrest. The accomplice, a colored man, was seen in the company of two white men, with a small dog, all cruising the Butte streets in a Cadillac the morning of their arrest. The jeweler who was bilked out of the watch reported them to the police. So did the haberdasher who was bilked out of the two hats, immediately he noticed that the countersignature on the traveler's check was a forgery.

9. They were acquainted, served time together in the Montana State Prison at Deer Lodge.

These are but a few of the corroborating facts found in the transcript.

On this showing, the jury convicted Harmon of first degree burglary and the court sentenced Harmon to ten years in the state penitentiary. For both Carter and Harmon it was a second offense. Carter, admittedly guilty of burglary and also of forgery, had been outside the state penitentiary barely seventy-two hours.

It is urged in a dissenting opinion that the lower Court "set out the correct rule to be followed in clear and unmistakable language in its instruction No. 18" and the instruction is set forth. It is urged that "this instruction the jury ignored." Honorable T. E. Downey, the Judge who tried the case, did not so conclude. He denied a motion for a new trial.

As hereinafter pointed out, the corroborating evidence need not be direct, it may be circumstantial; it need not be sufficient to justify a conviction, or to establish a prima facie

case of guilt; it need not be sufficient to connect the defendant with the commission of the crime; it is sufficient if it tends to do so. State v. Cobb, 76 Mont. 89, at page 92, 245 Pac. 265, infra.

### Statutes.

Controlling statutes are R.C.M. 1947, section 94-7220: "A conviction [in this case burglary in the first degree as defined and penalized by R.C.M. 1947, sections 94-901 to 94-905] cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.", and R.C.M. 1947, section 93-2001-1: "The jury, subject to the control of the court, in the cases specified * * * are the judges of the effect or value of evidence addressed to them, except when it is declared to be conclusive. They are, however, to be instructed * * *

"4. That the testimony of an accomplice ought to be viewed with distrust * * *"

### Specifications of Error.

As stated, the defendant specifies that the verdict is against the law and the evidence. We carefully reviewed these specifications of error. The sole question is what corroboration suffices for conviction on the testimony of an accomplice. Thomas Henry Harmon, George Edward Carter and Keith McMann were all principals. State v. Bean, 135 Mont. 136, 337 Pac. (2d) 930. See also 12 C.J.S. Burglary, section 29, page 688.

"To support a conviction of two persons for burglary, it is not essential that the entry shall be by both, but if one of them entered and was aided by the other in so doing both are guilty, and burglary may be committed by being present and aiding another in entering." 12 C.J.S. Burglary, section 10, page 675.

"It is not necessary to show that a person accused actually

entered if it appears that he aided and abetted in the breaking and entering." 12 C.J.S. Burglary, section 29, page 688.

Direct evidence, by an eye witness, of the burglarious entry is rarely available or required to sustain a conviction.

## Rules of Law on Accomplices.

In Britain and in the American federal courts, the trial judge's comments on the evidence include a cautionary ad-, monition against the well-known unreliability of an accomplice witness who may be seeking to protect himself. In American, state courts the cautionary admonition is conveyed through formal written instructions couched in statutory language. Reflecting Montana's territorial status, the Bannack statutes of 1864 permitted conviction in the testimony of accomplices (Crim. Prac. Act, Chap. 3, section 12, page 178), including players in a gambling game (page 243, section 175). The stat-. utes codified by the Virginia City Territorial Legislature in 1871-72 added the requirement for corroboration (Cod. Stat.. 1871, Crim. Prac. Act, section 316, page 238) "by such other evidence as shall *tend to connect* the defendant with the commission of the offense or the circumstances thereof." Emphasis supplied. Subsequent Montana Legislatures have extended the statute only to require (1) that corroboration must evidence more than the commission and the circumstances of the offense (necessarily known to all principals), and (2) the later cautionary requirement, met by British cautionary comment and American statutory instructions, that the testimony of an accomplice ought to be viewed with distrust.

The first term of the Montana Territorial Supreme Court convened May 17, 1865, but it was not until the August term 1877 that an appeal involving the sufficiency of corroboration by an accomplice was presented to this court. In the January term 1878, the question was raised for a second time. These are the cases of Territory v. Corbett, 3 Mont. 50, and Territory v. Mahaffey, 3 Mont. 112. These cases hold that an accomplice is treated as any other witness, save that his credibility may be affected by the fact that he is charged with the same

offense as the person against whom he testifies; that accomplices need not be corroborated on every item of testimony given by the same; and that testimony which tends to connect the defendant with the commission of the offense is admissible, though its weight is for the jury.

Since the time of these first decisions, the question has been carried to this court many times, not on the need for corroboration, which is statutory, but on the point of what is sufficient corroboration.

An accomplice is defined by Chief Justice Brantly as "one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of a crime. * * * One may become an accomplice by being present and joining in the criminal act, by aiding and abetting another in its commission, or, not being present, by advising and encouraging its commission; but knowledge and voluntary actions are essential in order to impute guilt." State ex rel. Webb v. District Court, 1908, 37 Mont. 191, 200, 201, 95 Pac. 593, 597, 15 Ann. Cas. 745, jury tampering; included with citations in 3 Jones on Evidence, 5th ed., section 813 at page 1525.

Necessarily, an accomplice must be in some manner a party to the crime. By custom he is called an accomplice when testifying against another party to the same crime. See 14 Am. Jur., Criminal Law, section 108, pages 839-40.

An accomplice was again defined by Chief Justice Brantly in the often cited Spotted Hawk murder appeal as "one who is guilty of complicity in the crime charged, either by being present and aiding or abetting in it, or by having advised and encouraged it, though absent from the place at which it is committed." State v. Spotted Hawk, 1898, 22 Mont. 33, 65, 55 Pac. 1026, 1036 (Whirlwind's confession at page 57 of 22 Mont., at page 1033 of 55 Pac. is the corroborating testimony), and this definition is repeated by Justice Matthews for the full court, with a review of the intervening cases, in State v. McComas, 1929, 85 Mont. 428, 433, 278 Pac. 993. The defini-

tion has long since become *stare decisis* in Montana. See also, State v. Geddes, 22 Mont. 68, 55 Pac. 919, and a companion murder case, State v. Welch, 22 Mont. 92, 55 Pac. 927; State v. Jones (robbery), 95 Mont. 317, 325, 26 Pac. (2d) 341, and, the most recently decided, State v. Bean, cited supra.

Corroboration is confirmation, that which confirms, proof. See People v. Bowlby, 135 Cal. App. (2d) 519, 287 Pac. (2d) 547, 53 A.L.R. (2d) 1147. In a legal sense corroboration is something which leads an impartial and reasonable mind to believe that material testimony is true. "Corroboration may also consist in admissions, declarations or conduct of the defendant, writings or other documentary evidence which *tends to show concert of action* between the accomplice and the defendant * * *." 3 Jones on Evidence (5th ed.), section 814, page 1526, citing Territory v. Mahaffey, supra. Emphasis supplied. "The question as to the competency of a witness is, of course, to be resolved by the court." Jones, supra, section 815, page 1529.

"* * * if the trial judge is satisfied that the evidence is corroborative, it is his duty to submit the case to the jury, and it then becomes a question for the jury to determine what effect should be given to the corroboration and whether it is sufficient to warrant a conviction." 22 C.J.S. Criminal Law, section 813, page 1417, citing State v. McComas, supra, and State v. Donges, 126 Mont. 341, 251 Pac. (2d) 254. The test under R.C.M. 1947, section 94-7220, is that the corroborating testimony *tends to connect*. State v. Bolton, 65 Mont. 74, 212 Pac. 504; State v. Yegen, 86 Mont. 251, 283 Pac. 210; State v. Jones, supra; State v. Deschamps, 118 Mont. 566, 168 Pac. (2d) 335. It may even be entirely circumstantial. State v. Ritz, 65 Mont. 180, 211 Pac. 298; State v. Yegen, supra; State v. Jones, supra.

The rule on corroboration is well put by Mr. Justice Holloway in State v. Cobb, 76 Mont. 89, at page 92, 245 Pac. 265, at page 266, where he says:

." (a) The corroborating evidence may be supplied by the defendant or his witnesses.

" (b) It need not be direct evidence—it may be circumstantial.

" (c) It need not extend to every fact to which the accomplice testifies.

" (d) It need not be sufficient to justify a conviction or to establish a *prima facie* case of guilt.

" (e) It need not be sufficient to connect the defendant with the commission of the crime; it is sufficient if it tends to do so.

" (f) Whether the corroborating evidence tends to connect the defendant with the commission of the offense is a question of law, but the weight of the evidence—its efficacy to fortify the testimony of the accomplice and render his story trustworthy—is a matter for the consideration of the jury." State v. Cobb, supra, has often been followed by this court. See State v. Yegen, supra; State v. Jackson, 88 Mont. 420, 430, 293 Pac. 309, 311; State v. McComas, supra; State v. Donges, supra; State v. Duran, 127 Mont. 233, 236, 259 Pac. (2d) 1051, 1052; State v. Phillips, 127 Mont. 381, 387, 264 Pac. (2d) 1009, 1012; State v. Slothower, 56 Mont. 230, 182 Pac. 270; State v. Ritz, supra; State v. Keckonen, 107 Mont. 253, 84 Pac. (2d) 341; State v. Jones, supra.

State v. Cobb, supra, has clearly established the formula by ██ ██ which the facts are judged. Each case rests on its own facts with the above formula applied to those facts. The corroborating evidence need not be sufficient to justify a conviction or even to establish a *prima facie* case of guilt. The corroborative evidence here raises more than suspicion; it is inconsistent with defendant's constitutional presumption of innocence; and it identifies the accused as the criminal the accomplice says he is. Jones on Evidence (5th ed.), section 814, page 1526. *It tends to connect.*

While not essential to this opinion, the early English cases and authorities following are of judicial historical interest in

the evolution of the doctrine permitting an accomplice to testify. Tho. Tonge's case, Kelyng 17-18, 84 Eng. Rep. 1061; the trial of Titus Oates (1685), 10 How. St. Tr., 1079 at 1185, and the treason prosecution of Robert Charnock, et al., tried at Old Bailey, 11 March 1696, 12 How. St. Tr., 1377, 1403-1405; Hawkins's Pleas of the Crown, 4th ed. (1762), Book 2, Chap. 46, section 18, page 432. Some subsequent English authorities are Regina v. Farler (1837), 8 C. & P. 106, 173 Eng. Rep. 418; Rex v. Baskerville (1916), 2 K.B. 658, 677; and Baron Joy's "Evidence of Accomplices" (1884), quoted at length in VII Wigmore on Evidence (3rd ed.), section 2057, pages 322, 323.

The hazard that an innocent man will be convicted by an accomplice who, as Charnock pled so bitterly three hundred years ago, "would by swearing against me take away my life to save his own" has in the instant case been repelled. The corroborating evidence *tends* to connect the defendant with the commission of the offense. Of its sufficiency, we entertain no doubt.

The judgment of conviction is affirmed.

MR. JUSTICES ANGSTMAN and CASTLES, concur.

MR. JUSTICES BOTTOMLY and ADAIR, (dissenting).

We dissent.

The defendant Harmon was informed against and charged with a serious crime. His liberty is in the balance. He, like any other person, has the safeguards of our Constitution and our statutes to protect him in the same manner as any other person. His liberty may not lawfully be taken away without due process of law.

The majority opinion quoting the Charnock case recognizes the hazard that an innocent man may be convicted by an accomplice who "would by swearing against me take away my life to save his own." This principle the majority lays aside, and then proceeds to affirm the conviction of this defendant upon the uncorroborated testimony of a self-confessed accom-

plice. By so doing the majority has stripped this defendant of the protection afforded him by law.

R.C.M. 1947, section 94-7220, provides:

"A conviction *cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself,* and *without the aid of the testimony of the accomplice,* tends to connect the defendant with the commission of the offense; *and the corroboration is not sufficient,* if it merely shows the commission of the offense, or the circumstances thereof." Emphasis supplied.

The court has applied and construed section 94-7220, supra, in the various decisions which appear in the majority opinion. We have no quarrel with most of the general statements of law found therein. We concede that Carter was an accomplice as well as a principal, and it is for this reason that the provisions of section 94-7220 have application here. We cannot concur in the majority opinion for the reason that it fails to apply and give effect to the salutary provisions of section 94-7220.

In State v. Geddes, 22 Mont. 68, 83, 55 Pac. 919, 924, Justice Hunt said: "* * * where convictions were asked for upon an accomplice's testimony, it is settled in this state by the statute quoted [now section 94-7220], that the corroboration *must be evidence from an independent source,* and it must be such that *this independent evidence, in itself, without considering the testimony of the accomplice at all,* tends to connect the defendant with the commission of the crime charged. Furthermore, it is not a satisfaction of the statute to corroborate an accomplice upon immaterial matters, or to prove merely that the crime charged has been committed, or the circumstances under which it has been committed; for there may be all such proof, and yet the additional essential evidence be lacking, which independently of the evidence of the accomplice, leads to the inference that the defendant is connected in a criminal way with the commission of the crime." Emphasis supplied.

This statement of the applicable law was reestablished by

Chief Justice Brantly in State v. Spotted Hawk, 22 Mont. 33, 55 Pac. 1026, wherein it was sought to corroborate Whirlwind's confession, implicating Spotted Hawk, by the testimony of Shoulder Blade. Such testimony was held not to be corroborative.

This same principle was reiterated by the court again in State v. Welch, 22 Mont. 92, 55 Pac. 927. The command of the statute is that the corroborating testimony must be viewed as if no testimony at all had been given by the accomplice. The other independent testimony must then be examined to see if it tends to connect the defendant with the commission of the offense. No reliance can be placed upon the testimony of the accomplice. We repeat here what was said in the above case. We have diligently searched the record in vain for evidence other than that given by the accomplice to connect the defendant with this crime of burglary and it is our carefully weighed opinion that there was no competent evidence whatever upon which to base a conviction.

The district court in this case set out the correct rule to be followed in clear and unmistakable language in its Instruction No. 18, wherein it was said:

"You are instructed that in determining whether or not the testimony of an accomplice has been corroborated as required by law, you must assume to be removed from the case the testimony of the accomplice, and then examine all other evidence with a view of determining if there be any inculpatory evidence, that is, tending to connect the defendant with the commission of the offense charged. If such other evidence does do that, then the testimony of the accomplice is corroborated. If it does not, then there is no corroboration, although the accomplice may be corroborated in regard to any number of facts sworn to by him."

This instruction the jury ignored. This instruction the majority opinion overlooks.

In reviewing this matter on appeal it is this court's duty to review the evidence presented by the State to see if the testi-

mony of the accomplice Carter was corroborated by independent testimony tending to connect defendant, Tom Harmon, with the commission of the offense charged. The question as to whether these is such corroboration is one of law for the court. State v. Yegen, 86 Mont. 251, 283 Pac. 210; State v. Jones, 95 Mont. 317, 26 Pac. (2d) 341.

In reading the entire transcript it is obvious that what the State set out to do here was to prove that some time between the hours of 11:30 p.m. and 3:20 a.m., being the late evening hours of the 13th of February and the early morning hours of the 14th of February 1958, Tom Harmon burglarized an apartment located at 209 Colorado Street in the City of Butte, County of Silver Bow, State of Montana.

From testimony by independent witnesses we first find Tom Harmon, at approximately 10:30 p.m. on February 13, sitting in the Oasis Bar on South Main Street in the City of Butte. At that time he was merely sitting at the bar drinking. While there, one Ferns, the victim of the alleged burglary, entered the bar, bought the entire house a drink, or as he expressed it, "timbered," cashed a check and bought a bottle of wine. After drinking his drink he asked the bartender to call a cab for him. The cab arrived and Ferns left the Oasis. Some time later the defendant, Tom Harmon, also left the Oasis. Ferns testified that while in the Oasis Bar he did not see Mr. Harmon and that he did not know or recognize Mr. Harmon then or at the trial.

We next find Mr. Harmon at about 11:00 o'clock in the evening of February 13th across the street from the Oasis Bar in the Silver Bar in company with a colored man. He stayed in the Silver Dollar from approximately 11:00 to 11:30 that evening. Two witnesses testified that Mr. Harmon was in the Silver Dollar at approximately this time. One witness said Harmon was with a colored man, another witness said that when she saw Harmon in the Silver Dollar he was standing down at the end of the bar by himself drinking a glass of beer.

The second witness testified she left the Silver Dollar Bar

at approximately 12:15 a.m., but was not sure that Harmon was still in the bar at that time. From approximately 11:30 p.m. to 12:15 a.m. that night until 3:20 a.m. in the morning of February 14th the record is absolutely silent as to the whereabouts of Tom Harmon. No competent testimony was introduced at any time as to where Harmon was during that period of time.

At 3:20 a.m. on February 14th, Butte City police officers investigating a prowler report, picked up Tom Harmon on South Colorado Street and took him to jail where they charged him with being drunk. They suspicioned Harmon might have been the prowler, but the complainant was wholly unable to identify the person of whom she had complained. However, from 3:20 a.m. until some time prior to 9:00 a.m., Harmon was held in the city jail in Butte on an intoxication charge.

When defendant was placed in jail he was searched by the police and found to have in his possession a small sum of change, the exact amount whereof could not be remembered by the arresting officers, and also two small bits of celluloid and a toy flashlight. These articles were returned to him when he was released.

Later, on the morning of the 14th, a colored man went into a jewelry shop in uptown Butte and purchased a small lady's wrist watch and paid for same with two traveler's checks. While buying the watch he conversed with the owner of the jewelry store wherein, according to the latter's testimony, the colored man made various conflicting statements. This aroused the storekeeper's suspicion and caused him to write down the license number of the car in which the colored man was riding.

Shortly thereafter this same colored man entered a hat shop in Butte where he purchased two hats and paid for same with a traveler's check. During the transaction, and while the colored man was countersigning the traveler's check, the shopkeeper testified his attention was distracted and he failed to examine or even look at the check until the colored man had left his shop. Thereafter, upon examining the check, the shop-

keeper became suspicious that the original signature and the countersignature affixed thereon by the colored man did not match. Whereupon, the shopkeeper reported this fact to the Butte City police. The jeweler from whom the colored man had purchased the lady's wrist watch also reported his suspicions to the Butte City police. These two reports made to the police at approximately 11:00 a.m., February 14, 1958.

Later that day, the colored man was picked up by the police. With him at the time was the defendant, Tom Harmon. The colored man was found to be in possession of the lady's wrist watch which he had that day purchased from the jeweler who had so reported to the police his suspicions concerning the traveler's checks.

Tom Harmon was then wearing one of the hats purchased by the colored man from the shopkeeper. The police sought to ascertain the true owner of the traveler's checks. They contacted Malcolm L. Ferns whose name appeared on the signature line on the checks. Ferns informed them that upon awakening in the morning he was unable to locate some traveler's checks and some small change which he thought that he had with him when he went to bed the night before.

It developed that while Harmon was in the Oasis Bar on the evening of February 13 that Ferns entered the bar and "timbered;" that thereafter a part owner of the bar called a taxi for Malcolm Ferns, who upon the arrival of the taxi, was assisted thereto by the driver who proceeded directly to Ferns' apartment at 209 Colorado Street, where at the entrance Ferns paid the driver his cab fare in the amount of $1 and then entered his apartment and went to bed. When he awakened in the morning, Ferns was unable to locate his book of traveler's checks or money, whereupon he telephoned the Oasis. He testified:

"A. The first thing, I called the Oasis Bar and asked if by chance if the swamper picked up a check book and he said there's nothing showing on the back bar. Secondly, I called the

Metals Bank and I told them to stop the checks, that I lost the check book.''

Ferns testified that he did not report his loss to the police and that he knew nothing whatever as to what had happened to the traveler's checks until he was contacted by the Butte police and by them informed that George Carter, the colored man, had countersigned and been passing Ferns' traveler's checks and that they, the police, had taken Carter, the colored man, into custody and had found in his possession merchandise which he had obtained by the passing of Ferns' traveler's checks.

There was one witness in the case who testified that while she and her sister were walking down the street in the 500 block on South Colorado Street, which is some three blocks distant from Ferns' apartment, she found one of Malcolm Ferns' traveler's checks; that after reading a story in a Butte newspaper concerning Ferns' traveler's checks that she delivered the check which she had found to the Butte city police.

Carter, the colored man, who admitted that he had in his possession, and that he had fraudulently countersigned and passed on to various shopkeepers in Butte for merchandise, the traveler's checks of Malcolm L. Ferns, took the witness stand for the State and there testified against the defendant Harmon. If Carter's testimony be true, which we seriously doubt, then Carter was, and is, not only an accomplice but also a principal of the first order to the alleged crime of burglary for which the defendant was then on trial. However, under the established law of this jurisdiction, Carter alone could not shift his admitted guilt to the shoulders of Harmon. Carter's testimony alone was insufficient, under our law, to sustain a conviction until and unless there was also produced some independent testimony that placed Harmon in Ferns' apartment at the time charged and for the unlawful purpose alleged.

Here, the only evidence in the entire case to establish that Ferns lost his traveler's checks and property as the result of

an alleged burglary is the testimony of Carter, the principal and accomplice who wound up with all but one of the lost checks in his possession. The testimony of the accomplice Carter alone is all that implicates the defendant Harmon with the alleged burglary of which Harmon now stands convicted.

Ferns did not even know whether or not he had taken all or any of his money with him when the taxi driver escorted him from the Oasis Bar to his home. Ferns did not know where his traveler's checks were when he left the Oasis Bar, when he arrived at his home, when he went to bed or when he got up the next morning. When Ferns awoke, on the morning after his big spree, he was unable to locate his traveler's checks and, acting upon the assumption that his checks must have been lost at the Oasis Bar and that they may have been retrieved by the bar's swamper, he telephoned that establishment.

When once we exclude or delete from the record before us the testimony of the principal and accomplice Carter, there remains not one iota of independent evidence that in any way or manner connects Tom Harmon with the entering of any house or apartment with any intent whatever to commit grand or petit larceny or any other crime.

The majority opinion lists nine separately numbered items which it asserts corroborates the testimony given by the accomplice Carter. An examination of such items demonstrates the patent error into which the majority has fallen.

First, the majority say "The accused was in the victim's presence when Ferns 'timbered' at the Oasis Bar." What of it? There were also plenty of others present to partake of the generous windfall when Ferns "timbered." As much can be said of each person at the bar when Ferns bought drinks for the house. One witness testified that three or four other people were there, while another testified there were five or six others there when Ferns "popped" for the crowd. Association or opportunity may make for suspicion, but never for cor-

roboration. It may tend to connect Mr. Harmon with drinking, but certainly not with the crime of burglary.

Second, the majority say that "The accused was in position to learn the location of the victim's room from the address Ferns gave the taxicab driver (assuming the accused did not already know it)." There is not a scintilla of evidence in the record that Malcolm Ferns gave the taxicab driver his address while they were in the Oasis Bar or at any other time or place. It was the witness, Walter LaChance, part-owner of the Oasis Bar, who called the taxicab, and it was the taxicab driver *who* assisted Ferns to the vehicle and then to the door of his apartment. Here, again every other person in the bar had the same opportunity, if any existed to obtain the same information respecting Ferns' place of abode. Thus is presented the outrageous proposition that opportunity to obtain such information would tend to connect each of those present with the commission of the crime of burglary. Of course, it goes without saying that no such presumption attaches to any of the many present at the Oasis when Ferns "timbered" or, when assisted by the tax driver, he departed the tavern.

Third, the majority say that "Each time the accused was arrested he was carrying two 'loids,' one with a blue mark; several police officers saw these at the time of each arrest; the accomplice testified the accused used a 'loid' and carried two, one with a blue mark." Again the infirmity here patent is that there is no evidence that places the accused at Ferns' apartment; that shows that he entered such apartment or that he there made criminal use of one of the "loids" other than the uncorroborated testimony of the accomplice Carter, and the use of such testimony of the accomplice to supply corroboration is barred by the statute.

Fourth, the majority say that Carter, "the accomplice said he threw Ferns' checkbook cover down in the street. The police found it where the accomplice [Carter] said he had thrown it. These two women found the fourth check in the same neighborhood." We do not consider some three city

blocks away as being "in the same neighborhood." In our examination of the record herein we are simply following the method correctly outlined by District Judge Downey in his Instruction No. 21 to the jury for determining from the testimony whether or not there is corroboration of the testimony given by the accomplice, George Edward Carter. Of course, Carter knew where he rid himself of Ferns' checkbook cover and Carter knew precisely where to take the police to recover it, but such evidence does not place Harmon at or in Ferns' apartment, nor does it connect Harmon with the breaking and entering of such apartment.

Fifth, the majority say "The accused and the accomplice were together in various Butte bars before and after the time of the burglary; also they were together on the shopping expedition the following day." Such conclusions and statement are not sustained by the record now before this court. By independent testimony the defendant was placed in the Oasis Bar and the Silver Dollar Bar. In the Silver Dollar Bar the defendant was with a colored man. However, a careful consideration of Carter's testimony discloses that he, Carter, spent considerable time in drifting back and forth between the Silver Dollar Bar and another bar in that vicinity known as the Silver Slipper. Carter never testified that he was in the Oasis. The record before us discloses that if the defendant was with Carter at all on the night in question, it was only while Carter was in the Silver Dollar Bar. Carter testified that he and the defendant were in the Silver Dollar Bar after the alleged burglary is claimed to have been committed, but the bartender then on shift at the Silver Dollar denied that either the accomplice Carter or the defendant Harmon was in the Silver Dollar that night after the hour of 12:30 a.m. Never was it directly established that Harmon and Carter were together on Carter's spending spree and shopping expedition the following day.

Sixth, the majority say that Carter, "The accomplice said he [Carter] forged Ferns' countersignature to two of Ferns'

checks to buy a wrist watch. When the accomplice [Carter] was arrested he had the wrist watch.'' Here again the majority rely upon and use the testimony of the accomplice Carter when the statute commands that they must exclude such testimony and examine and consider the evidence independently of any testimony of the accomplice Carter. While this testimony of the accomplice, in itself, might implicate Carter in the commission of some crime in connection with his confessed forgery of Ferns' checks, it most certainly does not connect Harmon, in the commission of an alleged burglary of Ferns' apartment by the breaking and entering therein in the nighttime.

Seventh, the majority say that Carter, ''The accomplice said he used another of Ferns' traveler's checks to buy the accused a hat. When arrested the accused, Harmon, was wearing the hat.'' While in a proper case this might have something to do with the crime of receiving stolen property and it might have some connection with the crime of forgery, but it most assuredly has nothing whatever to do with establishing the crime of burglary for which this defendant Harmon was then on trial. Here again both the State and the majority opinion place absolute reliance upon the testimony of the accomplice Carter in an attempt to prove a breaking and entry into Ferns' apartment by Harmon. All Carter's testimony is first, last and all the time, but the testimony of a self-confessed accomplice and the law says that the testimony of an accomplice must be ignored as incompetent until and unless there be corroboration by independent non-accomplice testimony. In other words, the record before us must be considered by the jury and examined by the members of this court precisely as though the accomplice Carter had never testified in order to ascertain whether there be the requisite corroborating testimony.

Eighth, the majority say, ''The accomplice and the accused, and McMann, were together during the morning of their arrest.'' All the record discloses in this regard is that Carter, a colored man, was seen in the company of two white men and

a small dog riding in a Cadillac on the streets of Butte. This was in broad daylight on the morning in question. The jeweler who sold Carter the lady's wrist watch reported his suspicions to the police as did the haberdasher who sold Carter the two hats when once the haberdasher discovered the countersignature on the traveler's check handed him by Carter to be a forgery. Now with what crime does all this tend to connect the defendant Harmon? Certainly it does not connect the defendant with the alleged crime of breaking and entering of Ferns' apartment any more than it tends to connect the small dog or the other white man in the car with the alleged burglary of Ferns' place of abode.

Ninth, the majority say that the accomplice Carter and the defendant Harmon "were acquainted" and that they "served time together in the Montana State Prison at Deer Lodge." We fail to see how the fact that the accomplice Carter and the defendant Harmon "were acquainted" or the fact that these two in company with four or five hundred other convicted persons, served out their sentences in the State's prison at Deer Lodge, corroborates the testimony of the accomplice Carter charging that it was Harmon who broke and entered Ferns' apartment on the night of February 13, 1958, being but two days after Carter's release from such state penitentiary.

The basic essential facts overlooked by the majority opinion are as follows:

There is absolutely no evidence whatever in the record now before this court that the defendant was ever at or in Ferns' apartment, or that any breaking or entering thereof occurred, or that the crime of burglary or any other crime was there committed to obtain the traveler's checks belonging to Ferns, except the testimony given by Carter, the colored man, who, if believed, was personally present at Ferns' room at 209 South Colorado Street for the express and admitted purpose of relieving Ferns of his money and valuables. The evidence is undisputed that bright and early on the morning of February 14, 1958, State's witness Carter was in the possession of trav-

eler's checks purchased by and bearing the signature of Malcolm L. Ferns, which traveler's checks were then being fraudulently countersigned by Carter, who, after decorating same with the forged countersignature of Malcolm L. Ferns then exchanged them for merchandise, first in the jeweler's store and next in the haberdasher's shop. In both etablishments Carter presented himself in person, alone and unattended. That to divert suspicion from himself and to implicate others in his dishonest and fraudulent scheme and acts in case he was caught, he bought one hat of the size to fit Harmon and another of a size that would fit some other person still does nothing whatever to place the defendant Harmon at or in Ferns' room at 209 South Colorado Street or convict him of breaking and entering such room at any time or for any purpose.

The fact persists and remains to haunt us that without Carter's testimony there is no evidence that a burglary was committed, or that Ferns did not lose his traveler's checks, or that Carter did not pick Ferns' pocket and take therefrom the loot, which he was carrying and putting into circulation while on his spending spree on the morning after Ferns had experienced a rather large evening. Ferns testified he had visited numerous and diverse bars; that he spent at least $120 during that one evening; that he did not know whether he had locked his door before retiring for the night; that he did not hear anybody come into his apartment; and that he did not miss his traveler's checks until he awakened from his sound sleep, and when he did miss them he saw no occasion for reporting it to the police. Instead he phoned the Oasis Bar to inquire if the bar's swamper had found any of the traveler's checks which he at that time assumed he lost or left on the bar.

To conclude that a burglary was committed at all necessarily implies that the testimony of Carter is relied upon, believed and weighed in the balance, contrary to the controlling rule of law which must be applied herein.

Competent independent testimony would prove that Harmon

on the night of February 13, 1958, was in the Silver Dollar Bar with a colored man. That evidence would not prove that Carter was the colored man with Harmon in the Silver Dollar Bar.

After Harmon left the Silver Dollar there is absolutely no evidence as to his whereabouts, his company or anything else. There is nothing that would tend to connect him with the commission of any crime during the time in question.

The evidence that Harmon was with a colored man in the Silver Dollar does not even raise a suspicion that Harmon was connected with the burglary charged or that he was connected with any crime. A suspicion however strong is not enough. Our law demands that *independent evidence must tend to connect the defendant with some fact which would implicate the defendant in the crime charged.*

It is essential therefore that the fact tending to connect the defendant with the crime must be a fact relating to some act or fact which is an element of the crime, even though the corroborative evidence be insufficient in itself to establish every element of the offense charged.

Even the suspicion that might be raised by the association of Harmon with the colored man in the Silver Dollar Bar would not be valid to support this conviction because this act only assumes a suspicious nature after you have heard and considered the testimony of Carter. Without that testimony it is nothing more than two men standing in a bar one white, one colored. Mere association is not sufficient to sustain this conviction. See State v. Gangner, 130 Mont. 533, 305 Pac. (2d) 338; State v. Keckonen, 107 Mont. 253, 84 Pac. (2d) 341, and State v. Searle, 125 Mont. 467, 239 Pac. (2d) 995.

The cashing of the traveler's checks by Carter does not implicate the defendant here nor tend to implicate him at all in the crime charged.

The majority opinion attaches considerable weight to the fact that two small pieces of celluloid were found in the pocket

of the defendant when, at 3:20 a.m., he was picked up and charged with being drunk.

It was not until Carter, after being picked up the following afternoon, told a story about participating in a burglary, that the police officers ascertained that there *might* have been a burglary committed.

Without the testimony of Carter as to how or why the bits of celluloid were employed, there were nothing but inanimate objects carried in Harmon's pocket precisely like the celluloid containers found in the card cases and billfolds carried by most business and professional men of today. The two bits of celluloid could arouse some suspicion that they could be used in the commission of a crime, but they do not necessarily tend to connect this defendant with the commission of a crime.

The majority opinion treats these two small bits of celluloid as if they are something special when they are nothing of the sort. Let the reader inspect his own billfold and card case and ascertain how many celluloid credit cards, and celluloid containers for his various lodge and club membership cards he constantly carries that are of the same material and type as the so-called "burglar tools" which the defendant had in his possession, all of which are equally as well adapted for opening the lock on a door as were the two pieces found in Harmon's possession and then returned to him by the police.

Ignoring here, as we must, the testimony of Carter, the two pieces of celluloid then do not even raise a suspicion of being tools designed to assist in committing burglaries any more than the same would raise a suspicion if found on any other person, be he lawyer, doctor or judge.

From the testimony of Carter, it is readily apparent that he is a principal in the crime he described. R.C.M. 1947, section 94-204, reads as follows:

"All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encour-

aged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics, or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkeness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed.''

Not only does Carter's testimony establish him to be a principal but it also shows him to be an accomplice in the crime he so glibly described. See State v. McKnight, 129 Mont. 8, 281 Pac. (2d) 816, 824, 825, and cases cited.

The testimony of an accomplice comes from a tainted source and is of the character of evidence the legislature considered unreliable and which it sought to protect against by the enactment of section 94-7220, supra. See Stephenson v. United States, 9 Cir., 1954, 211 F. (2d) 702, 704, 705, 53 A.L.R. (2d) 812.

The conclusions reached in the majority opinion are based upon the erroneous assumption that *the testimony of Carter both a principal and an accomplice, can be used and examined in this case to see if the other testimony is corroborated. This is not the law and has never been the law in this state.* The law is as stated in section 94-7220, that ''A *conviction cannot be had* on the testimony of an accomplice, *unless he is corroborated by other evidence * * * without the aid of the testimony of the accomplice * * *.*'' Emphasis supplied.

Until *independent* evidence or testimony is introduced in a trial of this nature the testimony of the accomplice is not even pertinent to the record. It is only at the time when the indipendent evidence or testimony is introduced which tends to connect the defendant with the commission of the crime that then and only then can the testimony of the accomplice be considered. *There is no testimony here, independently given, which tends to connect the defendant, with the commission of the crime charged since no competent, independent testimony was introduced to show that any crime was ever perpe-*

*trated*. It must be realized that the testimony of Carter is entirely incompetent. Carter's testimony then becomes the only testimony upon which this defendant was convicted. Carter's testimony comes from a tainted source and must be viewed with suspicion, and this defendant cannot be convicted on this testimony according to the provisions of R.C.M. 1947, section 94-7220, supra.

It can be seen that the law demands and the law positively requires that the defendant *cannot be convicted unless the accomplice's testimony is corroborated.*

With Carter's testimony out of this case all that is left is suspicion. Even the suspicion is very weak but in any event we know that we cannot convict on suspicion alone. In State v. Jones, 95 Mont. 317, 324, 325, 26 Pac. (2d) 341, 343, the court held "* * * it is necessary that the independent evidence lead to an 'inference that the defendant is connected in a criminal way with the commission of the crime.' State v. Geddes, 22 Mont. 68, 55 Pac. 919, 924; State v. Spotted Hawk, 22 Mont. 33, 55 Pac. 1026.''

Under our Constitution and statutes a defendant cannot be convicted on mere conjectures, probabilities, or suspicions however strong as in some countries. The majority opinion, in effect, overrules State v. Jones, supra; State v. Keckonen, supra; State v. Searle, supra; and State v. Gangner, supra, on the question of the corroboration required of the testimony given by an accomplice. A man's liberty may not be taken away without "due process of law."

For the reasons stated, the judgment of conviction should be reversed, the information ordered dismissed, the defendant Harmon be discharged from custody and the cause be remanded to the district court for such purposes.